**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HUTTIG SASH & DOOR CO., Inc., Respondent.**

No. 18451.

United States Court of Appeals Eighth Circuit.

May 31, 1967.

Nancy M. Sherman, Atty., N.L.R.B., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Edith E. Nash, Atty., N.L.R.B., Washington, D. C., with her on the brief.

George V. Gardner and Frederick F. Holroyd of Gardner & Gandal, Charleston, W. Va., for respondent.

Before BLACKMUN, MEHAFFY and LAY, Circuit Judges.

BLACKMUN, Circuit Judge.

We are here primarily concerned with an application of the teachings of NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed. 486 (1967), and NLRB v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967).

The National Labor Relations Board seeks enforcement of its order issued August 31, 1965, to Huttig Sash and Door Company, Inc., and reported as 154 NLRB No. 67. The Board panel by that order, and upon exceptions filed by both sides, unanimously affirmed the findings of its trial examiner as to claimed unfair labor practices by Huttig in violation of § 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (5) and (1). Some of these findings were against Huttig; others were in its favor. The order contained the usual cease and desist provisions and required Huttig to bargain upon request, to restore premium wage rates to 11 employees, to make those employees whole for any losses suffered, and to post notices. The union is Carpenters District Council of St. Louis and Vicinity.

The facts are not disputed. Huttig is engaged in the manufacture and sale of doors, windows and other millwork. The company was a party to a multiple-employer contract with the union covering the four calendar years 1963–1966 which "shall not be subject to change or modification during such period for any cause or reason whatsoever". This contract succeeded an earlier one for the immediately preceding four calendar years. Article 3 of the agreement specified six work classifications, ranked A through F, each applicable to several described job titles. Minimum hourly wage rates and dates for increases in those minimums during the contract period were specified. The increases, with the exception of those for the A classification, were to be 10¢ at the beginning of each of the calendar years 1964 and 1965; the A increases were more frequent and aggregated 35¢ over the contract period. In addition, the agreement provided, separately for each classification, that all employees "who are receiving wages in excess of those minimum rates specified above as of January 1, 1963, January 1, 1964, and January 1, 1965, shall receive an hourly wage increase of ten (.10) cents per hour". It thus assured any above-the-minimum employee a 10¢ increase at the beginning of each of the calendar years 1964 and 1965.

The contract's Article 21, entitled "Transfer," stated,

"In the event that the Employer transfers an employee to a higher or lower classification different than which said employee is presently occupying, then and in that event such employee shall be compensated at his original rate of pay for a period not to exceed thirty (30) days."

Its Article 2, entitled "Recognition of Company Rights", read in part,

"The management of the business and the direction of the working force is the responsibility of the Company including the right to hire, transfer, promote, demote, maintain quality and efficient operation, the right to hire new employees and to direct the working force, to discipline, suspend, discharge, transfer or terminate employees because of lack of work, in accordance with 'Seniority Clause' * * * providing, however, that none of the powers herein reserved to the Company shall be * * * inconsistent with the terms of this contract."

Article 7, called "Grievance Procedure-Arbitration", provided,

"Should differences arise between the Company and the Union as to the interpretation of this Agreement, or should any other dispute whatsoever arise between the parties hereto, an earnest effort shall be made to settle such differences immediately in the following manner."

Then followed a description of the grievance procedure and

"In the event such complaint or grievance shall not have been satisfactorily settled, the matter shall then be submitted to an arbitration committee of three (3) for final decision."

By letter dated November 19, 1964, Manager F. K. Wunder notified the union that, beginning with the November 30 pay period, hourly rates of 11 named employees "will be adjusted to conform to their current job classification" and that the reductions "are in conformity with present Agreement". One of these employees was in the B classification; the other 10 were in C. The 11 had been receiving premium rates, that is, rates in excess of the contract minimums, for some time. All had worked for the company for many years. The adjustments, ranging from 6¢ to 22¢ per hour, took the wage rates down to the stated minimums for 1964. The reasons assigned by the company were that it was necessary to economize in order to meet competition and that the employees were no longer able to produce as they had in the past. In ensuing conversation with Ollie Langhorst, the union's business agent, Wunder justified the reduction under the management reservations in Article 2. Langhorst's reply was that the company's action was "inconsistent with the terms of this contract", within the very language of Article 2. Wunder also suggested that the change was permitted under the Transfer provisions in Article 21.

On November 30 Wunder called each of the 11 employees into his office individually and advised him that his wages were being cut beginning that day. No material change in the employees' jobs occurred.

Neither side invoked the contract's grievance and arbitration procedure.

The Board found that Huttig had violated § 8(a) (5) and (1) of the Act by unilaterally modifying the contract in midterm over the union's objection and without following the procedure prescribed by § 8(d) and the contract itself; that this was so even assuming a bargaining impasse; that there was no bona fide impasse anyway; that the company's contention that its conduct was permitted by the agreement "must fall in view of the plain and unambiguous provisions of the contract"; and that the complaint was not to be dismissed just because Huttig's conduct could also have been challenged under the contract's grievance and arbitration procedure.

Huttig's brief, as we read it, asserts that the wage rate reductions did not constitute, as the trial examiner and the Board found, a unilateral modification of the contract; that such description is a contradiction in terms and equates with an allegation of breach of contract; that

it is not for the Board to correct a contract breach; that the Board's decision rests "on its interpretation of the contract"; that the Board cannot "sit in judgment of the meaning of language contained in collective bargaining contracts"; that Huttig in good faith agreed with the union that all disputes were to be settled by the specified grievance procedure and arbitration; that the present dispute is one to be settled in that manner; and that the decision encourages the bypassing of contractual duties by labeling any contract disagreement an unfair labor practice.

Three issues are presented:

1. Has the Board properly found that the reductions were unilaterally effectuated by Huttig and that this was done without fulfilling its obligation to bargain collectively and thus was in violation of § 8(a) (5) and (1)?

2. Does the Board have jurisdiction to determine whether Huttig was guilty of an unfair labor practice when, in so doing, the Board is required to evaluate Huttig's interpretation of the collective bargaining agreement?

3. Does the Board have unfair labor practice jurisdiction when the contract provides for grievance procedure and arbitration?

The Board issued its order shortly before the Courts of Appeals denied enforcement in NLRB v. C C Plywood Corp., 351 F.2d 224 (9 Cir. 1965), and Acme Industrial Co. v. NLRB, 351 F.2d 258 (7 Cir. 1965). Certiorari was thereafter granted in each of those cases. 384 U.S. 903, 86 S.Ct. 1337, 16 L.Ed.2d 357; 383 U.S. 905, 86 S.Ct. 893, 15 L.Ed.2d 662. By the time this matter was presented to us, the two cases had been argued before the Supreme Court and were under submission. We deferred decision. Both *C & C Plywood* and *Acme* were then unanimously reversed and remanded. 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 and 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495. We asked counsel to submit comments as to the results reached by the Supreme Court and as to their pertinency and application here. Their comments have been received.

1. The issue of compliance with § 8 (a) (5) and (1).

Section 8(d), 29 U.S.C. § 158(d), which need not be set forth in full here, defines the phrase "to bargain collectively" as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages * * * or the negotiation of an agreement, or any question arising thereunder, * * * but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *." It provides that where a collective bargaining agreement is in effect, the duty to bargain also means "that no party to such contract shall terminate or modify such contract", except upon specified notice to the other party, an offer to meet and confer, timely notification to the Federal Mediation and Conciliation Service and to the corresponding state agency, and the continuation, without resort to strike or lockout, of all terms of the existing contract for 60 days after such notice or until the contract expires, whichever is later. These last provisions were also incorporated in Article 24 of the parties' contract.

A refusal to bargain collectively, as so defined, is an unfair labor practice. Section 8(a) (5).

■ It is well settled that an employer violates § 8(a) (5) when, absent waiver by the union, it changes employees' wages without giving the union an appropriate opportunity to bargain about the change. NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); Fibreboard Paper Prod. Corp. v. NLRB, 379 U.S. 203, 209–210, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); NLRB v. Frontier Homes Corp., 371 F.2d 974, 979 (8 Cir. 1967).

■ We have no difficulty in concluding that the Board on this record appropriately found that Huttig by its action refused so to bargain and thus committed an unfair labor practice. The re-

duction in wage rates was effected in midterm. The credited testimony is to the effect that it was done over the protest of Langhorst and without the union's agreement. No legally cognizable bargaining impasse, which we can detect, had come about, for there was a clear absence of bargaining here and not an inability to agree during bargaining. Industrial Union of Marine & Shipbuilding Workers v. NLRB, 320 F.2d 615, 621 (3 Cir. 1963), cert. denied 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472; NLRB v. Yutana Barge Lines, Inc., 315 F.2d 524, 529–530 (9 Cir. 1963). Huttig allowed no room for discussion. Its letter of November 19 precluded this and in the subsequent conversations with Langhorst and the employees it was stated that the reductions would be put in effect irrespective of union protest. Those meetings were informative only and not negotiative in purpose.

■ In any event, the notices prescribed by § 8(d) and by the contract itself were admittedly not given. Even if a genuine bargaining impasse had come about, this, on the facts here, does not eliminate the necessity of compliance with the notice provisions. There was no change in the contract's classifications, no material change in the jobs performed by the employees at the time, and no shift of an employee between classifications.

■ 2. The issue of Board jurisdiction in the presence of contract evaluation.

In *C & C Plywood* the employer similarily was charged with an unfair labor practice. Its alleged offense was inaugurating a premium pay plan in midterm without consultation with the union. The agreement reserved to the employer the right to pay a premium rate as a reward and the option to reduce that rate to the contract level. Grievance machinery was established but there was no provision for arbitration. The Board ruled that the union had not ceded power to the employer unilaterally to change the wage system. The Court of Appeals denied enforcement because it felt that the

existence of an unfair labor practice did not turn entirely on the Act's provisions but "arguably upon a good-faith dispute as to the correct meaning" of the bargaining agreement. P. 228 of 351 F.2d. The theory was that any such contract question was one for the courts under § 301 of the Labor Management Relations Act, 1947, 29 U.S.C. § 185. The Supreme Court, in reversing and in directing enforcement, rejected the argument that the Board was without power to decide a case involving the interpretation of a labor contract. Although it recognized that Congress had not given the Board "generalized power" to determine rights under collective agreements, the Court held that in that case the Board "has done no more than merely enforce a statutory right which Congress considered necessary to allow labor and management to get on with the process of reaching fair terms and conditions of employment", and the "Board's interpretation went only so far as was necessary to determine that the union did not agree to give up these statutory safeguards", pp. 427–428 of 385 U.S., p. 564 of 87 S.Ct., and that the Board thus did not exceed its jurisdiction. In reaching this conclusion the Court stressed the factors of delay and imprecision of remedy which would otherwise present themselves. "For in the labor field, as in few others, time is crucially important in obtaining relief". P. 430, 87 S.Ct. p. 565. The Court further held that the Board's conclusions that the agreement gave the employer no unilateral right to institute its premium pay plan and that the union had not, by waiver, foregone its statutory right to bargain about that plan were not erroneous. Thus, on the merits, it deferred to the Board's expertise.

The facts in *C & C Plywood* are remarkably close to the Huttig facts. Although that employer was seeking to institute a premium pay plan whereas Huttig's activities were in the opposite direction, this difference is obviously of no legal consequence. A more important difference may be the absence of an arbitration provision in the C & C Plywood contract and the presence of one in the

Huttig contract. One must recognize that the Supreme Court, in evaluating the employer's argument, gave weight to this absence of an arbitration clause and to the ultimate "economic warfare" result if differences were not resolved through the grievance procedures. P. 426, 87 S.Ct. p. 563. We feel, however, that this is only one factor in the Court's decision and that it is not the pivotal factor.

Any concern one might have about the controlling significance of the absence or presence of an arbitration provision, and thus of the particular precedential authority of *C & C Plywood* here, is set at rest or is at least alleviated, we think, by the companion decision in *Acme*. That case concerned the obligation of an employer to furnish information which allows a union to decide whether to process a grievance. The bargaining agreement contained a statement of company policy not to subcontract work normally performed by unit employees where subcontracting would cause layoff or prevent recall. The employer agreed that if equipment were moved to another location employees consequently subject to reduction or layoff might, under certain circumstances, transfer to the new location. The agreement also provided a grievance procedure culminating in compulsory and binding arbitration. The company moved certain machinery from its plant. The union inquired. It was told that there had been no violation of the contract and that the company was not obliged to answer questions regarding the machinery. Grievances and then unfair labor practices were charged. The Board ruled that the employer had violated § 8(a) (5). The Court of Appeals denied enforcement, holding that the arbitration provision foreclosed the Board from exercising its statutory power. The Supreme Court reversed. It observed that "The relationship of the Board to the arbitration process is of a quite different order" than the relationship of courts to arbitrators when an award is under review, and that here again "the Board was not making a binding construction of the labor contract" but "was only acting upon the probability that the desired information was relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities." In referring to arbitration the Court said that "the assertion of jurisdiction by the Board in this case in no way threatens the power which the parties have given the arbitrator to make binding interpretations of the labor agreement". Thus, "Far from intruding upon the preserve of the arbitrator, the Board's action was in aid of the arbitral process". The Court stressed that an opposing view would overburden the arbitration process. Pp. 436–438 of 385 U. S., p. 569 of 87 S.Ct.

*Acme's* facts, of course, are different from those before us and the Court there appropriately referred, pp. 435–436 of 385 U.S., p. 568 of 87 S.Ct., to "the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties", an aspect which is much less apparent in the present case.

It is also possible, perhaps, for one to say that in *C & C Plywood* the Court emphasized the absence of an arbitration provision and seemingly used this in partial justification of the conclusion it reached, whereas in *Acme* it contrarily expressed concern about overburdening that same arbitral process. If there is any trace of logical inconsistency here, it is lost and rendered meaningless, we think, in what we regard as the other overriding and vital features of the two decisions, namely, that, of itself, neither the presence of a problem of contract interpretation nor the presence of an arbitration provision in the contract deprives the Board of jurisdiction.

We detect in the two decisions a desire, and perhaps even a policy, on the part of the Court to give impetus to the various ways of settling labor disputes; to expedite these matters; to avoid delay either in the courts or in the arbitration process; to emphasize and protect, in cases of doubt, and to give priority to,

statutorily declared rights; to regard as no more than secondary any contract interpretation aspect of what is regarded as basically an unfair labor practice dispute or as merely related to primary Board function under the Act; to take a broad, and not a narrow or technical, approach to the Act and to the multiplicity of channels available for resolving disputes; and not to close the door upon Board expertise when such restraint is clearly not violative of congressional mandate.

We regard the two cases together as controlling on this issue and hold that the Board did not exceed its jurisdiction in such evaluation as it made of Huttig's contract defense.

3. The issue of Board jurisdiction in the presence of a contract provision for grievance procedure and arbitration.

 It may be conceded, for we think it is readily apparent from the language of Article 7 of the contract, that grievance procedure and arbitration were available for the resolution of the parties' dispute. Despite the presence of language that "an earnest effort shall be made to settle such differences immediately in the following manner", we hold that the grievance-arbitration route is not exclusive here and does not prevent the prosecution of an unfair labor practice charge. There is no necessary or automatic mutual exclusiveness as between the contract remedy and the unfair labor practice remedy. Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 268, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964). We see nothing of contrary precedent, as Huttig suggests, in Woody v. Sterling Aluminum Prod. Corp., 365 F.2d 448 (8 Cir. 1966), cert. denied 386 U.S. 957, 87 S.Ct. 1026, 18 L.Ed.2d 105. And we are not confronted with the question whether the Board in its discretion should decline to exercise its unfair labor practice jurisdiction in the face of an arbitration award already outstanding, see *Carey,* supra, pp. 270–271 of 375 U.S., p. 408 of 84 S.Ct. for the grievance-arbitration

procedure was not invoked here by either party. *Acme* itself, with the arbitration provision in its collective agreement, affords positive precedent.

The same need for avoiding inordinate delay in the recognition and implementation of a labor organization's rights; the same recognition that there may be more than one way to settle a labor dispute; the same emphasis upon preserving rights statutorily expressed; the obvious effectiveness of the Board remedy here; the possible need to obtain it eventually anyway; *Acme's* emphasis, pp. 436–437 of 385 U.S., 87 S.Ct. 565, on the peculiar nature of the relationship between the Board and the arbitration process, and upon § 10(a) of the Act, 29 U.S.C. § 160 (a); and the same desirability of not rendering unavailable the Board's expertise in its traditional area, all bear upon this aspect of the jurisdictional problem and prompt us to conclude that the presence of a contract provision for both grievance procedure and arbitration does not eliminate Board jurisdiction of an unfair labor practice charge in the present context.

 This would take us finally to the merits. But Huttig in its brief here, so far as grievance and arbitration procedure is concerned, argues only jurisdiction and not the merits. We do not hesitate to say, however, that the Board's decision does not strike us as being unreasonable or improper or wrong. In contrast to the situation in NLRB v. Honolulu Star-Bulletin, Inc., 372 F.2d 691, 693 (9 Cir. 1967), we do not find in this contract anything which gives Huttig the unlimited right to eliminate premium wage rates. The management provisions of Article 2 do not do so; we are not concerned with any classification transfer under Article 21; and our reaction to Article 3 and its several references to premium rates is that it provides more of an emphasis upon preserving those differentials than upon giving Huttig the right unilaterally to do away with them.

The Board's order will be enforced.