NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SOUTH CENTRAL BELL TELEPHONE
COMPANY, Respondent.

No. 81–4159.

United States Court of Appeals,
Fifth Circuit.

Oct. 4, 1982.
Rehearing Denied Nov. 2, 1982.

Elliott Moore, Deputy Assoc. Gen. Counsel, N. L. R. B., Candace M. Carroll, John E. Higgins, Jr., Robert G. Sewell, Washington, D. C., for petitioner.

John C. Carey, Jr., Birmingham, Ala., Robert Sutherland, Robert K. McCalla, Steven Hymowitz, New Orleans, La., for respondent.

Before BROWN, GEE, and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

The National Labor Relations Board ("Board") petitions us for enforcement of its order of January 14, 1981, against South Central Bell Telephone Company ("Bell"), 254 N.L.R.B. 315 (1981). That order held Bell in violation of section 8(a)(1) and (3) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1) and (3) (1976), for singling out union stewards for longer suspensions when punishing some of its employees for participation in a strike that transgressed a contractual no-strike clause. We enforce.

## I. FACTS AND DISPOSITION BELOW.

The facts in this case are undisputed. Bell, one of the 19 companies associated with American Telephone & Telegraph, provides telecommunications services to five southern states, Alabama, Kentucky, Louisiana, Mississippi, and Tennessee. Bell and the Communication Workers of America, AFL–CIO ("Union") were parties to a collective bargaining agreement ("contract") in force from August 7, 1977, through August 9, 1980. That contract covered, *inter alia*, employees working at Bell's Hammond, Louisiana, facility and declared in pertinent part:

Article 21

ADJUSTMENT OF GRIEVANCES

. . . .

21.05 A. As the parties have agreed on procedures for handling complaints and grievances, they further agree that there will be no lockouts or strikes during the life of this Agreement.

. . . .

Article 28

RESPONSIBLE UNION–COMPANY RELATIONSHIP

28.01 The Company and the Union recognize that it is in the best interests of both parties, the employees and the public that all dealings between them continue to be characterized by mutual responsibility and respect. To insure that this relationship continues and improves, the Company and the Union and their respective representatives at all levels will apply the terms of this Contract fairly in accord with its intent and meaning and consistent with the Union's status as exclusive bargaining representative of all employees in the unit. Each party shall bring to the attention of all employees in the unit, including new hires, their purpose to conduct themselves in a spirit of responsibility and respect and of the measures they have agreed upon to insure adherence to this purpose.

On July 31, 1979, 21 of 23 unit employees who were scheduled to report to work at the Hammond facility called in sick. On August 1, 1979, 19 of 23 employees who were scheduled to work at the Hammond facility again called in sick. Bell believed that these employees were engaged in an unprotected strike in violation of article 21.05A. Therefore, Bell gave two-day suspensions to all employees who were absent only on July 31, four-day suspensions to all employees who were absent on both July 31 and August 1, and additional five-day suspensions to five union stewards who had been absent on one or both of those days. Thus, Union stewards George Blades, Mike Jenkins, Ronny Neal, and Gary Stanga each received nine-day suspensions, and Union steward Sidney Alexander received a seven-day suspension. The suspension notices given to all rank-and-file employees stated: "[Name of employee] was suspended for [number] days from [date] to [date] for his participation in an unauthorized walkout. He is advised that further occurrences of this nature will result in discharge, barring unusual mitigating circumstances." The suspension notices given to all five union stewards contained the above language, with an additional sentence stating: "The fact that [name of employee] is a union representative was taken into account in determining the length of the suspension."

In 1972, at its Columbia, Tennessee, facility, Bell had disciplined union stewards who violated a no-strike clause identical to article 21.05A in a prior contract more severely than employees who held no union office. That differential treatment was grieved as unfair and discriminatory. Because the Union and Bell could not resolve the grievance, they submitted it to an arbitrator. In 1974, the arbitrator upheld the punishment, declaring "that because of their official positions [the union stewards] had a higher degree of responsibility and a more severe punishment is appropriate." When the contract was renewed in 1977, article 21.05A was not changed, and the arbitrator's ruling was not specifically repudiated in the new contract.

After Bell's decision in this case, the Union filed unfair labor practice charges with the Board's general counsel, who issued a complaint alleging section 8(a)(1) and (3) violations. The parties waived a hearing before an administrative law judge and submitted the case to a three-member Board panel on stipulated facts. The panel acknowledged the 1974 arbitration decision but did not defer to it. It found no evidence that the stewards engaged in any activities different from those of the employees who did not hold Union office, such as urging support of the stoppage or inducing participation in it. The stewards had "merely participated" in the unauthorized strike. The panel thus concluded that the differential treatment was based solely on

the stewards' Union status, a violation of section 8(a)(1) and (3) of the Act. It ordered Bell to cease and desist from such practices, to rescind the excess suspensions, and to make the stewards whole for lost wages and benefits. 254 N.L.R.B. at 316–17.

The Board seeks enforcement of that order. This case presents two issues. First, should the Board have deferred to the 1974 arbitration decision? Second, was the differential treatment of the stewards a violation of section 8(a)(1) and (3) of the Act?

## II. THE 1974 ARBITRATION DECISION

██ Bell contends that the 1974 decision is an integral and binding part of the 1977 contract to which this court and the Board must defer under 29 U.S.C. § 173(d)[1] as interpreted in the *Steelworkers* trilogy.[2] These authorities are inapposite, since the Supreme Court long ago declared that the relationship between courts and the arbitration process, the subject of the *Steelworkers* trilogy, is "quite different" from the relationship between the Board and the arbitration process when the Board is exercising its unfair labor practice jurisdiction.

1. 29 U.S.C. § 173(d) declares:
   Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. The [Federal Mediation and Conciliation] Service is directed to make its conciliation and mediation services available in the settlement of such grievance disputes only as a last resort and in exceptional cases.

2. *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

3. Bell also places far too much reliance on § 173(d). That section, by its own language and statutory context, was originally directed primarily, if not exclusively, at the Federal Mediation and Conciliation Service, *see supra* n.1, not the Board. The *Steelworkers* trilogy applied § 173(d)'s policy to the courts, but not to the Board. *See Acme*, 385 U.S. at 436-37, 87 S.Ct. at 568. When Congress desired to alter

*NLRB v. Acme Industrial Co.*, 385 U.S. 432, 436–37, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967); *see also NLRB v. Strong*, 393 U.S. 357, 360–61, 89 S.Ct. 541, 544, 21 L.Ed.2d 546 (1969).[3] It is the latter relationship we review today since we are not asked to enforce directly an arbitration decision but to review the Board's refusal to do so.[4] The standards governing our review are found in 29 U.S.C. § 160(a) and in the Board's decision in *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955).

Thus focused, this issue involves two related yet distinct arguments as to why the Board should defer to the 1974 arbitration decision. The first is that, since this controversy centers on the same no-strike clause at issue in 1974, that decision has binding precedential effect. Further, since the 1977 contract contained the same no-strike clause and did not specifically repudiate or limit the 1974 decision, it has been ratified by the parties and incorporated by silence into their 1977 contract.

*Precedential Effect*

██ Section 160(a) declares in relevant part: "The Board is empowered ... to

the scope of the Board's § 160(a) unfair labor practice jurisdiction, it did so expressly. *See, e.g.,* 29 U.S.C. § 160(a) (Board permitted to cede some of its unfair labor practice jurisdiction to state agencies); 160(k) (Board permitted to defer to voluntary private adjustment of unfair labor practices arising out of jurisdictional strikes).

4. Hence, the well-established doctrine of judicial deference to arbitration decisions when directly asked to enforce them in a private suit and those cases invoking the question of whether courts may give arbitration decisions prospective effect in a private suit do not control our disposition. *See, e.g., Oil, Chemical & Atomic Workers International Union Local 4–367 v. Rohm & Haas, Texas, Inc.*, 677 F.2d 492 (5th Cir. 1982) (per curiam); *W. R. Grace & Co. v. Local Union No. 759, International Union of United Rubber Workers*, 652 F.2d 1248 (5th Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982); *New Orleans S. S. Association v. General Longshore Workers*, 626 F.2d 455 (5th Cir. 1980), *aff'd sub nom. Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association*, —— U.S. ——, 102 S.Ct. 2673, 73 L.Ed.2d 327 (1982).

prevent any person from engaging in any unfair labor practice.... This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise." Under section 160(a), therefore, the Board clearly need not have deferred to the 1974 decision. However, the Board, in the exercise of its discretion, may choose to honor arbitration awards under certain circumstances. In *Spielberg*, the Board announced three criteria that would determine its "recognition" of an arbitration award: "the proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act." 112 N.L.R.B. at 1082. *Spielberg* retained its vitality after the *Steelworkers* trilogy, *see, e.g., NLRB v. Plasterers' Local No. 79*, 404 U.S. 116, 136–37, 92 S.Ct. 360, 372, 30 L.Ed.2d 312 (1971), and has been endorsed by the Supreme Court and nearly all of our sister circuits.[5] We join them in approving the *Spielberg* doctrine as well.[6]

■ It is the duty of the courts to insure Board adherence to the *Spielberg* doctrine. Six circuits have addressed the question of the standard of review used in evaluating Board application of the *Spielberg* doctrine. All agree that it is an abuse of discretion standard.[7] We agree with these cases and adopt the abuse of discretion standard.

Having decided the standard of review, we turn to the Board's actions here. In reliance on its prior decisions, the Board declined to defer to the 1974 arbitration decision since it was repugnant to the Act, one of the three *Spielberg* criteria. *See* 254 N.L.R.B. at 317 n.4. Specifically, the decision was repugnant to the Act since the Board

has held that it is a violation of Section 8(a)(3) and (1) of the Act for an employer to single out union stewards for discipline where the stewards merely participated in an unprotected strike along with other employees. In so concluding the Board [has] reasoned that such different treatment of stewards must necessarily be based upon the stewards' status as union officers rather than upon their conduct as employees, since the stewards had engaged in the same actions as other employees. The Board [has] held that, where a steward had not instigated or led an unprotected work stoppage, he could not be disciplined for his "lack of actions as a steward" in failing to take steps to terminate the work stoppage.

*Id.* at 317 (footnotes omitted). Thus the issue is narrowed to this question: Is this statutory interpretation an abuse of the Board's discretion?

■ Because Congress in section 160(a) gave the Board primary responsibility over

5. *See, e.g., Plasterers Local No. 79*, 404 U.S. at 136 37, 92 S.Ct. at 372; *NLRB v. Designcraft Jewel Ind.*, 675 F.2d 493, 496 (2d Cir. 1982) (per curiam); *NLRB v. Motor Convoy, Inc.*, 673 F.2d 734, 735 (4th Cir. 1982); *Pioneer Finishing Corp. v. NLRB*, 667 F.2d 199, 201 02 (1st Cir. 1981), *petition for cert. filed*, 50 U.S.L.W. 3949 (U.S. May 22, 1982) (No. 81 2162); *NLRB v. Pincus Bros., Inc.—Maxwell*, 620 F.2d 367, 372 (3d Cir. 1980); *Bloom v. NLRB*, 603 F.2d 1015, 1018 20 (D.C.Cir.1979); *Hawaiian Hauling Serv., Ltd. v. NLRB*, 545 F.2d 674, 675 76 (9th Cir.), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1976); *Dreis & Krump Mfg. Co. v. NLRB*, 544 F.2d 320, 330 (7th Cir. 1976); *John Klann Moving & Trucking Co. v. NLRB*, 411 F.2d 261, 263 (6th Cir. 1969); *Illinois Ruan Transport v. NLRB*, 404 F.2d 274, 280 (8th Cir. 1968); *NLRB v. Auburn Rubber Co.*, 384 F.2d 1, 3 4 (10th Cir. 1967).

6. This circuit has previously indicated implicitly its approval of the *Spielberg* doctrine. *See T.I.M.E.—D.C., Inc. v. NLRB*, 504 F.2d 294, 302–03 (5th Cir. 1974); *Steve's Sash & Door v. NLRB*, 430 F.2d 1364, 1365 (5th Cir. 1970) (per curiam). *Cf. NLRB v. Railway Clerks*, 498 F.2d 1105, 1109–10 (5th Cir. 1974) (upholding prearbitration nondeferral by the Board under its *Collyer* doctrine). We take this opportunity to remove any doubt of our approval of the *Spielberg* doctrine and join the unanimous view of our sister circuits.

7. *See, e.g., Pincus Bros.*, 620 F.2d at 372 (3d Cir.); *Hawaiian Hauling*, 545 F.2d at 676 (9th Cir.); *Associated Press v. NLRB*, 492 F.2d 662, 666 (D.C.Cir.1974); *NLRB v. Horn & Hardart Co.*, 439 F.2d 674, 679 (2d Cir. 1971); *Auburn Rubber*, 384 F.2d at 3 (10th Cir.); *Ramsey v. NLRB*, 327 F.2d 784, 786 (7th Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1054 (1964).

unfair labor practices, we seek guidance on this issue from case law in areas of labor law in which the Board also has primary responsibility.

In *Ford Motor Co. v. NLRB*, 441 U.S. 488, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979), the issue before the Court was whether in-plant cafeteria and vending machine food services are "terms and conditions of employment" subject to mandatory collective bargaining. In affirming a Board decision that they are, the Court described the role of the Board in this area and the judicial deference due as a result:

> It is thus evident that Congress made a conscious decision to continue its delegation to the Board of the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain. This case, therefore, is one of those situations in which we should "recognize without hesitation the primary function and responsibility of the Board ...," *NLRB v. Insurance Agents*, 361 U.S. 477, 499 [80 S.Ct. 419, 432, 4 L.Ed.2d 454] (1960). ...
>
> Of course, the judgment of the Board is subject to judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute. *NLRB v. Iron Workers*, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978). In the past we have refused enforcement of Board orders where they had "no reasonable basis in law," either because the proper legal standard was not applied or because the Board applied the correct standard but failed to give the plain language of the standard its ordinary meaning. *Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166, 92 S.Ct. 383, 390, 30 L.Ed.2d 341 (1971). We have also parted company with the Board's interpretation where it was "fundamentally inconsistent with the structure of the Act" and an attempt to usurp "major policy decisions properly made by Congress." *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1967). Similarly, in *NLRB v. Insurance Agents*, 361 U.S., at 499, 80 S.Ct., at 433, we could not accept the Board's application of the Act where we were convinced that the Board was moving "into a new area of regulation which Congress had not committed to it."
>
> The Board is vulnerable on none of these grounds in this case. Construing and applying the duty to bargain and the language of § 8(d), "other terms and conditions of employment," are tasks lying at the heart of the Board's function. With all due respect to the Courts of Appeals that have held otherwise, we conclude that the Board's consistent view that in-plant food prices and services are mandatory bargaining subjects is not an unreasonable or unprincipled construction of the statute and that it should be accepted and enforced.

*Id.* at 496–97, 99 S.Ct. at 1848; *see also Charles D. Bonanno Linen Service, Inc. v. NLRB*, 454 U.S. 404, 408–11, 102 S.Ct. 720, 723–24, 70 L.Ed.2d 656 (1982) (primary responsibility for resolving multiemployer bargaining problems committed to Board by Congress; judicial review of Board actions limited); *NLRB v. L. B. Priester & Son, Inc.*, 669 F.2d 355, 359 (5th Cir. 1982).

Thus the Court has variously phrased the test for deferring to the Board's statutory interpretation and decisions in areas for which it has primary responsibility. The Board's view should be sustained if it is "reasonably defensible" or "has a reasonable basis in law." Alternatively, the Board's opinion is valid if it is not "fundamentally inconsistent with the structure of the Act" or "an attempt to usurp 'major policy decisions made by Congress.'" The courts must also defer to the Board if its decision is not a movement "into a new area of regulation which Congress had not committed to it" or an "unprincipled construction of the statute." Finally, the Board's interpretation should not be "rejected merely because the courts might prefer another view of the statute."

Since the Board with this decision has clearly not moved into forbidden areas of

regulation or usurped a congressional prerogative, declining to defer to the 1974 arbitration decision was not an abuse of discretion under those two criteria.

■ As to whether the NLRB's view of the Act is principled, reasonable, and consistent with the Act, the question is somewhat more complex. The Union and the general counsel urged the Board to ground its unfair labor practice finding on the absence of affirmative duties in the contract for union officers during an illegal strike. *See* 254 N.L.R.B. at 316. This is the view of most of the circuits that have addressed the issue and the view we adopt today. *See infra* Part III. However, the Board in this case apparently continued to adhere to its legal view that disparate discipline can *never* be imposed, even if the officers flout affirmative contractual obligations. *See* 254 N.L.R.B. at 317 & nn. 2, 3, *citing Bethlehem Steel Corp.*, 252 N.L.R.B. 982 (1980), *enforcement denied in pertinent part sub nom. Fournelle v. NLRB*, 670 F.2d 331 (D.C. Cir.1982); *Gould Corp.*, 237 N.L.R.B. 881 (1978), *enforcement denied*, 612 F.2d 728 (3d Cir. 1979); *Precision Casting Co.*, 233 N.L.R.B. 183 (1977). This is the equivalent of a *per se* rule that union officers' protected status cannot be bargained away. As the court in *Fournelle* indicated, the Board has vacillated between this *per se* view, which has been unanimously rejected by all of the courts of appeal that have considered it, and the view held by the circuit courts of appeal that protected status can be explicitly bargained away. *See* 670 F.2d at 338–41.

In Part III *infra*, we join our sister circuits in disapproving the Board's *per se* rule. However, we affirm the Board's unfair labor practice finding on another ground—that this contract does not expressly and unmistakably waive the offi-

cer's statutory protection. For the purposes of reviewing the Board's discretion to reject the 1974 decision, we hold similarly. The Board's *per se* rule is contrary to the Supreme Court's holdings that statutory protections of this type can be expressly waived in a contract. *See NLRB v. Magnovox*, 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956). Therefore, the Board abused its discretion here by not following the Court's rule. However, since the contract at issue does not meet the standards for waiver, the Board was nonetheless correct in declining to defer.[8]

*Ratification and Incorporation by Silence*

Bell's second argument is that the 1977 contract ratified and incorporated by silence the 1974 arbitration decision. Since there is no clause in the 1977 contract that can be construed, even liberally, as expressly incorporating or ratifying the 1974 decision, we are faced with interpreting only the parties' silence. We find Bell's argument untenable for several reasons.

■■ We begin with the premise that judicial interpretation of silence in a document or in a law is always a tricky and controversial undertaking. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith v. Curran*, —— U.S. ——, —— – ——, 102 S.Ct. 1825, 1851–52, 72 L.Ed.2d 182 (1982) (Powell, J., dissenting) (criticizing the "novel theory" that congressional intent can be inferred from its silence). This is especially true with labor contracts, since their formation is typically characterized by intense bargaining and the final contract usually represents hard-fought negotiations and compromises. Quite often, employers and unions exchange numerous quid pro quos,

---

8. The parties, in an attempt to bolster their arguments as to whether the Board is bound by arbitral precedent, joust over an analogous but different proposition: whether arbitrators are bound by prior arbitration decisions, *i.e., stare decisis* among arbitrators. The learned authorities are divided on this issue. *Compare, e.g.,* Elkouri & Elkouri, *How Arbitration Works* 377 (3d ed. 1973) (*stare decisis* "usually" followed between arbitrators) *with, e.g.,* Coulson, *Labor Arbitration: What You Need to Know* 69, 78 (1973) (contra); Levin & Aksen, *Arbitrating Labor Cases* 52 (1974) (same). However, because the Board operates in a statutory framework absent from private contract arbitration, we find the analogy to this area of law quite weak and the persuasive value of the arguments equally low. We thus decline to choose between the competing views, and these authorities play no role in our disposition.

giving clauses and rights in direct exchange. This is particularly so in negotiations over no-strike clauses and grievance/arbitration procedures. *See American Manufacturing Co.*, 363 U.S. at 567, 80 S.Ct. at 1346. Because of this the Supreme Court has strongly cautioned courts against reading in changes or exceptions to such clauses. *See id.* They should be interpreted based on their plain and literal meaning so as to avoid interference with the private bargain.

▬ Thus, in this case the principle that "labor contracts generally state affirmatively what conditions the parties agree to," *Torrington Co. v. Metal Products Workers Local 1645*, 362 F.2d 677, 681 (2d Cir. 1966), is particularly apt. Silence should not be and is not dispositive of the parties' intent in a labor contract. Giving the equivalent of *stare decisis* effect to prior arbitration decisions should be compelled by an express clause in the contract, *see Metropolitan Edison Co. v. NLRB*, 663 F.2d 478, 484 (3d Cir. 1981), *cert. granted,* ──── U.S. ────, 102 S.Ct. 2926, 73 L.Ed.2d 1327 (1982); *Riverboat Casino, Inc. v. Local Joint Executive Board*, 578 F.2d 250, 251 (9th Cir. 1978), not read into a contract by a court far removed from the negotiations. As this court said recently in a case of direct judicial enforcement of an arbitration award not involving an unfair labor practice charge: "Whether there is a 'law of the contract' between the parties once an arbitrator decides an issue and what effect, if any, is to be given precedent are not primarily, if at all, questions for judicial resolution." *New Orleans Steamship Association*, 626 F.2d at 468.

▬ Beyond the impropriety of a court's reading into the silence of the 1977 contract a *stare decisis* clause, we detect additional evidence that such a clause would be incompatible with the contract as written. Article 23.02 permits all arbitration over disciplinary action to proceed through an expedited arbitration process. Under that process:

> E. The umpire's decision shall apply only to the instant grievance, which shall be settled thereby. It shall not constitute a precedent for other cases or grievances and may not be cited or used as a precedent in other arbitration matters between the parties unless the decision or a modification thereof is adopted by the written concurrence of the representatives of each party at the fourth step of the grievance procedure.
>
> . . . .
>
> H. The umpire shall have no authority to add to, subtract from, or modify any provisions of this Agreement.

It would be strange indeed for the 1977 contract to incorporate the 1974 arbitration decision by silence while requiring the express written approval of the parties before giving precedential effect to disciplinary decisions under the expedited arbitration process during its own existence. Article 23.02 demonstrates to us that in the 1977 contract when the parties agreed to a particular arbitration procedure, they expressly so stated; when they had no agreement, they said nothing. Thus there was no "meeting of the minds" over the effect of the 1974 decision, and this court should not substitute its judgment for that of the parties.

Finally, permitting ratification or incorporation, whether express or implicit, of an arbitration decision also involving an unfair labor practice and judicially mandating Board adherence to it would circumvent the express policy of 29 U.S.C. § 160(a), which gives the Board the exclusive power to decide unfair labor practice questions.

We conclude that ratification or incorporation by silence of the 1974 arbitration decision is not permitted by principles of labor law contract interpretation, the structure of the 1977 contract, and section 160(a). The Board properly exercised its discretion in not deferring to the 1974 decision.

*Summary*

If this court were to declare the 1974 decision binding on the Board, we would open a loophole in section 160(a) that would render private resolutions of unfair labor

practices insulated from Board scrutiny and immune from evaluation under *Spielberg* or other criteria established by the Board.

As the court in *NLRB v. Huttig Sash & Door Co.*, 377 F.2d 964 (8th Cir. 1967) (Blackmun, J.) said, "of itself, neither the presence of a problem of contract interpretation nor the presence of an arbitration provision in the contract deprives the Board of jurisdiction." *Id.* at 969 (interpreting *Acme, supra,* and *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967)). Further, the Supreme Court has held that if the Board disagrees with an arbiter's conclusion in an unfair labor practice controversy, "the Board's ruling would, of course, take precedence." *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964). The Board here was squarely presented with an issue within its unfair labor practice jurisdiction and neither the necessity of interpreting the labor contract nor the existence of an arbitration award interpreting the relevant contract provisions bars the Board from asserting its jurisdiction; interpreting the contract in accordance with the Act, and declining to follow the 1974 decision. Only the Board has the power to surrender its section 160(a) jurisdiction. Parties to a labor contract may not oust the Board's statutory jurisdiction or obviate its public law duties by private fiat. *See, e.g., Railway Clerks*, 498 F.2d at 1109; *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778, 803 (5th Cir. 1973); Stone, *The Post-war Paradigm in American Labor Law*, 90 Yale L.J. 1509, 1531–35 (1981).

## III. DISPARATE DISCIPLINE OF UNION OFFICERS.

Section 8(a)(3) of the Act prohibits employers from discriminating against employees with respect to "any term or condition of employment to encourage or dis-

courage membership in any labor organization." It is well established that " 'membership' as used in section 8(a)(3) refers not only to the employee's basic decision whether to join or remain in a union, but also to his decision as to the level of his participation in the union and union activities." *Teamsters, Local 20 v. NLRB*, 610 F.2d 991, 993 (D.C.Cir.1979), *citing Radio Officers Union v. NLRB*, 347 U.S. 17, 39–42, 74 S.Ct. 323, 335–337, 98 L.Ed. 455 (1954); *see also United Association of Journeymen and Apprentices v. Borden*, 373 U.S. 690, 695, 83 S.Ct. 1423, 1426, 10 L.Ed.2d 638 (1963). Because holding union office is the "essence of protected union activities," *General Motors Corp.*, 218 N.L.R.B. 472, 477 (1975), *enf'd mem.*, 535 F.2d 1246 (3d Cir. 1976), section 8(a)(3) prohibits employer discrimination against union officers based solely on their status. *Hammermill Paper Co. v. NLRB*, 658 F.2d 155, 163 (3d Cir. 1981), *petition for cert. filed*, 50 U.S.L.W. 3622 (U.S. Jan. 29, 1982) (No. 81–1438).

Section 8(a)(1) makes it an unfair labor practice to "interfere with, restrain or coerce employees in the exercise" of their section 7 rights. Section 7 provides in pertinent part: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . ." 29 U.S.C. § 157 (1976). Section 8(a)(2)–(5) was intended by Congress to be a nonexhaustive list of four specific types of employer behavior barred by section 8(a)(1).[9] Thus, a violation of any of section 8(a)(2)–(5) also constitutes a violation of section 8(a)(1).

From sections 7, and 8(a)(1) and (3) thus emerges a strong congressional policy

---

**9.** The House Committee Report on the Act declared:

The succeeding unfair labor practices are intended to amplify and state more specifically certain types of interference and restraint that experience has proved require such amplification and specification. These specific

practices, as enumerated in subsections (2), (3), (4), and (5), are not intended to limit in any way the interpretation of the general provisions of subsection (1).

H.R.Rep.No.969, 74th Cong., 1st Sess. 15 (1935).

mandating the protection of union officers from interference and coercion by an employer. Of course, such congressionally granted fundamental rights may be bargained away in a contract by a union. *See NLRB v. Magnavox Co.*, 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

■■■ Bell correctly argues that the Act and the circuits that have considered the question permit disparate disciplining of union officers. However, it fails to point out that such discipline cannot be based on mere status but must be based on clear and specific contractual language, *see, e.g., Metropolitan Edison Co. v. NLRB*, 663 F.2d 478 (3d Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 2926, 73 L.Ed.2d 1327 (1982); *C. H. Heist Co. v. NLRB*, 657 F.2d 178 (7th Cir. 1981). This circuit has long held that contractual waivers of such fundamental statutory rights must be "clear and unmistakable." *Prudential Insurance Co. v. NLRB*, 661 F.2d 398, 401 (5th Cir. 1981), *quoting NLRB v. Item Co.*, 220 F.2d 956, 958–59 (5th Cir.), *cert. denied*, 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955).

In determining whether the contractual clauses at issue here are "clear and unmistakable" waivers, we travel a path well lit by precedent.[10] At one end of the spectrum, the specificity required to support disparate discipline is illustrated by *Gould, Inc. v. NLRB*, 612 F.2d 728 (3d Cir. 1979), *cert. denied sub nom. Moran v. Gould Corp.*, 449 U.S. 890, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980), where the following contractual provisions were deemed adequate to support disparate punishment of a steward:

Section 1. For the duration of this Agreement, and except for the failure of the Company or the Union to comply with the arbitration provisions of the Agreement, the Union agrees that it shall not call, sanction, or engage in any strike, slowdown or stoppage of work; and the Company agrees that it shall not cause or engage in any lockout.

Section 2. Any employee or employees, either individually or collectively, who shall cause or take part in any illegal, unauthorized or uncondoned strike, work stoppage, interruption or impeding of work during the life of this Agreement may be disciplined or discharged by the Company. It is recognized that any such action by the Company shall be subject to the Grievance Procedure.

Section 3. In the event of an illegal, unauthorized or uncondoned strike, work stoppage, interruption or impeding of work, *the Local and International Union and its officers shall immediately take positive and evident steps to have those involved cease such activity. These steps shall involve the following:*

*Within not more than twenty-four (24) hours after the occurrence of any such unauthorized action, the Union, its officers and representatives shall publicly disavow same by posting a notice on the bulletin boards throughout the plant. The Union, its officers and representatives shall immediately order its members to return to work, notwithstanding the existence of any wild-cat picket line. The Union, its officers and representatives shall refuse to aid or assist in any way such unauthorized action. The Union, its officers and representatives, will in good faith, use every reasonable effort to terminate such unauthorized action.*

*Id.* at 730 n.3 (emphasis added).

In *Gould*, shop steward Moran participated in an illegal strike. Of the illegal strikers, only he was discharged. The court upheld this disparate discipline since Moran did nothing to fulfill his express section 3 obligation to take affirmative steps to end the illegal strike. *Id.* at 733.

---

10. We note, as the Board did below, *see* 254 N.L.R.B. at 317 n.3, that this case involves no instigation or leadership of the strike, merely participation. The stewards here, the stipulated facts show, behaved no differently than the nonofficer strikers. Cases of union officer instigation or leadership of illegal strikes are treated differently by the Board. *See, e.g., Midwest Precision Castings*, 244 N.L.R.B. 597 (1979). The cases we are guided by involved no instigation or leadership.

The other end of the spectrum is illustrated by *Metropolitan Edison*, where this general no-strike clause was held insufficient to justify disparate treatment:

> The Brotherhood and its members agree that . . . there shall be no strikes or walkouts by the Brotherhood or its members, and the Company agrees that there shall be no lockouts of the Brotherhood or its members, it being the desire of both parties to provide uninterrupted and continuous service to the public.

663 F.2d at 480. *Metropolitan Edison* involved the president, vice president, and members of a union who refused to cross the picket line of another union to reach their work site. One hundred thirty-five members received five- or ten-day suspensions, while the president and vice president received twenty-five-day suspensions for refusing to cross the picket line. The court held that since the contract imposed no duty on them to halt an illegal work stoppage, the disparate discipline was an unfair labor practice. *Id.* at 483; *see also Heist, supra; Hammermill*, 658 F.2d at 163.[11]

From these cases, the guiding principle is clear: absent specific contractual obligations to the contrary, union officers may not be disparately disciplined for mere participation in or the failure to take affirmative steps to end an illegal stoppage.[12] It is clear to us that articles 21.05A and 28.01 fall well short of imposing specific duties on union officers in the event of an illegal strike and thus are not a "clear and unmistakable" waiver of their protected status. Article 21.05A is merely a general

---

**11.** Bell urges us also to consider the case of *Fournelle v. NLRB*, 670 F.2d 331 (D.C.Cir. 1982). However, *Fournelle* is inapplicable since the contract clause at issue there was far broader than the standard no-strike clause present here. *See id.* at 333‑34. Judge Edwards specifically excluded cases such as ours from consideration in *Fournelle*. *See id.* at 338 & n.15.

**12.** The rationale for this principle was well summarized recently by a commentator:

> In the day-to-day conduct of their job, union officers cannot be said to feel a greater duty to their employers by virtue of their union status. After all, they owe their offices to the union and its members; their duty and loyalty extend to those people. The union officer frequently must act in the employer's interest, but largely because both union and employer have real interests in the enforcement of their collective bargaining agreement. When the [officer] is pressed, though, it will usually be the employer's interests which give way. The imposition of duties owed by the officer to the employer, absent explicit contractual provision for them, would merely create a legal standard which would be honored in the breach more often than not.
>
> Moreover, the inference of duties by the Board and the courts, rather than the explicit creation of duties by the parties themselves, would violate basic principles of agency law. The law has long imposed upon the agent "a duty to his principal to act *solely* for the benefit of the principal in all matters connected with his agency." In short, the special duties of union officers are owed to the union, not the employer. The duty requires the agent to act in accord with the principal's instruction on all "matters entrusted to him on account of the principal. . . . If a contract contains a no-strike clause, then in all likelihood a union officer's refusal to head off a wildcat strike will be a breach of duty to the union. But, since "[a]n agent is not liable for a harm to a person other than his principal because of his failure adequately to perform his duties to his principal," only the union may complain of the officer's nonfeasance. If the employer has a complaint, it must be directed at the union.
>
> On the other hand, as the Board . . . recognizes, if the officer participates in, leads or encourages a work stoppage, the officer, when viewed as an *employee*, has violated a duty to the employer, as well as to the union. Similarly, if an officer/employee disregards a specific contractual provision creating a duty owed by the officer as an employee, that employee has violated a duty owed to the employer. Discipline on this basis derives from officers' failure to fulfill responsibilities as employees rather than from their special roles as union representatives.
>
> Since the presumptions of the Act and basic agency law run counter to the inference of special duties, their existence should not be inferred. By requiring mutual and explicit definition of the duties which a union officer owes to the employer, troublesome reliance on implied and undefined duties can be eliminated. As such, the likelihood of arbitrary and discriminatory discipline will be diminished.

Rummage, *Union Officers and Wildcat Strikes: Freedom from Discriminatory Discipline*, 4 Indus.Rel.L.J. 258, 284–86 (1981) (footnotes omitted; emphasis original).

no-strike clause that imposes no specific duties on any individual. *See Metropolitan Edison, supra.* Article 28.01's statement that the Union and its representatives will "apply" the terms of the contract does not rise to the level of specificity required by *Gould.* It is no more than a general mutual pledge that cannot be the source of the specific waiver *Prudential Insurance* requires.[13]

Thus, although we disapprove the Board's *per se* rule in this area, the Board's conclusion that the disparate discipline here constituted an unfair labor practice was correct.

## IV. CONCLUSION.

Because the Board was correct in not deferring to the 1974 arbitration and in deciding the unfair labor practice issue, its application for enforcement of its order is granted.

ORDER ENFORCED.

---

13. We note as well, however, that just as a worker who is also a union officer may not be punished more severely than others because of that dual status, neither need he be favored. Even in the absence of a contractual provision, where an offender's knowledge and experience are properly relevant to discipline, they become no less so by reason of having accrued during or through his holding of union office.