**GENERAL MOTORS CORP., INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1644.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 2, 1982.

Decided March 2, 1983.

Roderick D. Gillum, Detroit, Mich., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Catherine Garcia, N.L.R.B., Washington, D.C., for respondent.

Before MARTIN and KRUPANSKY, Circuit Judges, and BROWN, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

This case is before the Court upon the petition of General Motors Corp., Delco Moraine Division (GM/Company) to set aside a Decision and Order of the National Labor Relations Board (NLRB), reported at 257 NLRB No. 146, requiring GM to produce its original time study data upon request by Local 696, United Automobile, Aerospace and Agricultural Implement Workers of America (Union). The NLRB has filed a cross-application for enforcement of its Order.

GM is a Delaware corporation engaged in the manufacture and non-retail sale and distribution of automobile products. Since at least 1940 GM and the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (International UAW) have been parties to successive company-wide collective bargaining agreements embracing production, maintenance and mechanical employees in GM facilities throughout the United States. These detailed agreements impact upon myriad facets of the employer-employee relationship. Limited concerns, such as seniority, are reserved to local negotiation;

no provision of any local agreement, however, may supersede or conflict with any provision contained in the National Agreement.

The *policy* concerning the production standard for determining the number of units required to be produced per shift per department appears in the collective bargaining agreement as follows:

(78) Production standards shall be established on the basis of fairness and equity consistent with the quality of workmanship, efficiency of operations, and the reasonable working capacities of normal operators.

The NLRB asserts, the record supports, and GM does not deny that the following procedure for ascertaining fair and equitable production standards, for the purpose of implementing the policy appearing in Paragraph 78 of the collective bargaining agreement, is currently employed:

In order to arrive at a production standard, the Company conducts timestudies of individual employees performing their tasks and of the operational delays occurring along an entire assembly line. In these studies, timestudy personnel make stop-watch observations and record their findings on worksheets. Among the data thus recorded are the timestudy observer's professional determinations as to which actual delays occurring during a study should be "allowed"—that is, taken into account in establishing a production standard—or "disallowed"—that is, ignored for production standard purposes because, for example, the observer considers the delay to be a non-recurring one.

Following a timestudy, the Company makes calculations from the raw data and records its conclusions on a form entitled "Time Study Elemental Breakdown." The first portion of the form lists the component elements of an employee's production operation and the number of seconds that the timestudy observer determined should be allocated to performing each element. The time judged necessary for producing one unit is derived by adding the times for these separate work elements. The second portion of the form, entitled "Delays", lists the amount of time that the timestudy observer "allowed" to be subtracted from the 8-hour shift due to functions such as clean-up, servicing equipment, or "personal" delays. Delays that occurred during the timestudy but that appear on the original worksheets as "disallowed" delays are not transferred to the Elemental Breakdown form. The third portion of the form divides the net number of minutes per shift (8 hours minus "allowed" delays) by the seconds allocated to producing one unit, thus arriving at the number of units expected to be produced on each shift—the production standard.

The collective bargaining agreement incorporates a grievance procedure through which an employee may challenge GM's production standards. A foreman or "time study man" must provide "all of the facts of the case" which relate to the production standard:

(79) When a dispute arises regarding standards established or changed by the Management, the complaint should be taken up with the foreman. If the dispute is not settled by the foreman or if the complaint is not taken up by the employee with the foreman, the committeeman for that district shall, without regard to the restrictions on his time as provided in Paragraphs (18) and (19a) of the Representation Section shall upon reporting to the foreman of the department involved, examine the job to determine the merits of the complaint. The employe may then file a grievance. The foreman or the time study man will furnish him with *all of the facts of the case.* If there is still a dispute after the committeeman has completed his examination, he may then re-examine the operation in detail with the foreman or the time study man. The committeeman will, upon request, be given in writing the work elements of the job without undue delay. When available, the cycle time or other pertinent data that is relevant to the dispute will be provided in writing

upon request; however, it is mutually recognized that it would be impractical to provide this information during periods of production acceleration. If the matter is not adjusted at this stage, it may be further appealed as provided in the procedure below. If the dispute is settled at any stage of this procedure, the parties to the settlement will, upon request of either party, specify in writing what the elements are that constitute the job as settled including a notation in assembly plants of the then current model mix and line speed and this information will be initialed and dated by the parties.

Both the policy incorporated in Paragraph 78, and the requirement that the Company produce "all of the facts of the case" for the processing of grievances as incorporated in Paragraph 79, attain their genesis from a 1940 collective bargaining agreement and appear in all collective bargaining agreements which have been executed thereafter.

The contractual language "all of the facts of the case", as appearing in Paragraph 79, has twice been interpreted by umpires. In 1947 a grievant challenging GM's production standards sought "Management's broken down time study of the job." Umpire Ralph T. Seward (Seward) concluded:

Under Paragraph 79, the foreman or the time study man is required to furnish the Committeeman who is conducting such an investigation with "all of the facts of the case." The facts may properly include not only the over-all standard time for the job but the broken down figures upon which that over-all time was based.

Although this conclusion resolved the narrow issue of contractual interpretation before the umpire, an additional observation was tendered:

That does not mean, of course, that Management is required to turn over to the Committeeman the original work sheets used by the Time Study Department in making the study and setting the standard. But it is clearly required to furnish all relevant information from such work sheets which the Committeeman requests.

Since Seward's conclusion that the original work sheets were beyond the scope of discovery addressed an issue of contractual interpretation which was not presented by the grievant, such can at best be construed as dictum.

The second and last umpire decision interpreting "all of the facts of the case" as employed in Paragraph 79 issued in 1949 by Umpire Gabriel Alexander (Alexander). The grievant had been reprimanded for curtailing production. Unsatisfied with the "broken down time" for his job, grievant submitted and requested a response to twenty written questions.[1] Umpire Alex-

1. 1. What was the name of the worker who was studied?
2. How long has this man been on that type of work and how long has he been on that job?
3. What was the seniority date of the operator?
4. When was the Time Study conducted? (Date and time of day).
5. On what machine (and/or location of job) was the operation performed?
6. What tools and equipment were used on that job?
7. What was the condition of the tools, machine and all necessary equipment used?
8. What was the piece produced, and what were the material specifications of the piece?
9. What were the tolerances and inspection requirements, and in what manner and how intensive was that inspection?
10. What was the location of the stock and where was the finished part placed?
11. How long was the Study? (Total number of minutes that the Time Study man took readings.)
12. How many pieces were produced during this Study?
13. Was the performance of the operator satisfactory during the Study?
14. What types of delay occurred during the Study, what caused them, and how long was each delay?
15. What portion (if any) of the observed time was *not allowed* by the Corporation and why?
16. How many minutes per day are allowed for personal time? (Going to the bathroom and getting a drink of water.)
17. How many minutes per day allowed for fatigue time? (Rest periods, smoking.)
18. How many minutes per day were allowed for each of the following factors?
(a) tool trouble
(b) line delays
(c) inherent delay

ander concluded that the answers to said twenty questions were among the "facts of the case" and ordered GM to provide answers to the extent possible with information in its possession. The memorandum opinion observed:

> It by no means follows that Management is obligated to revise its methods of time study so as to coincide with the Union's theories on the subject, or to make special investigations or compilations so as to be ready at all times to answer any question promulgated by a Committeeman. Its obligation under Paragraph 79 is fulfilled upon disclosure of all facts actually in its possession. In essence, the principle of Paragraph 79 in this respect is no different from the well known principle of responsible collective bargaining on any subject. That is, that each party should fairly disclose all the facts in its possession and that neither participant should take advantage of the unawareness of the other.

In July 1979, GM established a production standard of 8960 units per shift on its Department 531 X-Car Acme operation (Acme job). The Union filed a grievance protesting this standard and requested access to the original time study sheets utilized by GM to set the new production standard. The Company refused this and all subsequent Union requests to examine original time studies for the Acme job. During an April 1980 meeting concerning the Acme job grievance, the Union inquired whether the Company had included an allowance for damaged pieces, or "scrap", in promulgating the production standard. Company negotiators thereupon recessed, examined the original time study, returned and informed the Union that an appropriate scrap allowance had been incorporated. GM refused the Union's request to independently review the figures. In May 1980, GM and the Union resolved the July 1979 Acme job grievance by negotiating a new production standard of 7800 units per shift. Two weeks later, GM submitted to the Union a list of operational delays which had purportedly been eliminated from the Acme job. Because this list included no figures, the Union questioned the total time that been recovered by the listed improvements. A GM foreman responded that he was unable to provide that information. In July 1980, GM increased the Acme production standard to 9100 units per shift. The Union filed a grievance protesting this standard and requested the "work elements" and original time study calculations relied upon to establish the standard. The Company refused to provide the time study and failed to produce the elemental breakdowns. GM similarly refused to produce original time study data when demanded by the Union in challenge to a production standard increase from 5200 to 5997 units per shift in Department 529, the master cylinder assembly line.

On February 21, 1981, the Union filed an unfair labor practice charge with the Regional Director of the 9th Region of the National Labor Relations Board alleging that GM violated Sections 8(a)(1) and (5) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1) and (5)[2] by refusing to provide the Union with original time study information relative to production standards. The NLRB's Decision and Order affirmed the conclusion of an ALJ that GM had violated the Act and Ordered GM to

(d) tool crib time
(e) machine cleanup
(f) change of tools and equipment
(g) receive instructions from foreman
(h) personal cleanup
(i) check in and out
19. Was the time allowed for the factors mentioned in 18 based on the Time Study?
20. What has been the production of any and all of the operators doing the job in question and what has been the expected production on that job?"

**2.** § 158. *Unfair labor practices*
(a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

     *     *     *     *     *     *

   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

supply its original time study information. This appeal ensued.

■ An employer's refusal to provide the Union with information which is relevant and necessary to the bargaining function violates Sections 8(a)(1) and (5) of the Act. *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *Southwest Bell Telephone Co. v. NLRB,* 667 F.2d 470, 474 (5th Cir.1982); *NLRB v. Truitt Mfg. Co.,* 351 U.S. 149, 151–54, 76 S.Ct. 753, 754–56, 100 L.Ed. 1027 (1956); *Timken Roller Bearing Co. v. NLRB,* 325 F.2d 746, 750 (6th Cir.1963), *cert. denied,* 376 U.S. 971, 84 S.Ct. 1133, 12 L.Ed.2d 85 (1964). Further, "[t]he grievance procedure is . . . part of the continuous collective bargaining process." *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). The Union's access to adequate information concerning grievances allows it to render considered judgments and eliminate unmeritorious claims at an early stage in the proceedings. *See: NLRB v. Acme Industrial Co.,* 385 U.S. at 438, 87 S.Ct. at 569; *General Electric Co. v. NLRB,* 466 F.2d 1177, 1184 (6th Cir.1972); *Procter & Gamble Mfg. Co. v. NLRB,* 603 F.2d 1310, 1317 (8th Cir.1979). Accordingly, a violation of Section 8(a)(5) may be predicated on the failure of the employer to provide the Union with information necessary to enable the requesting party to intelligently evaluate and process grievances. *NLRB v. Acme Industrial Co., supra; NLRB v. Safeway Stores, Inc.,* 622 F.2d 425, 429 (9th Cir.1980); *San Diego Newspaper Guild, Local No. 95 v. NLRB,* 548 F.2d 863 (9th Cir.1977).

■ In determining if an employer is obligated under the Act to supply particular information, the Board need only find that the desired information is relevant and useful to the Union in carrying out its statutory duties and responsibilities. *NLRB v. Acme Industrial Co., supra,* 385 U.S. at 437, 87 S.Ct. at 568; *NLRB v. Truitt Mfg. Co., supra,* 351 U.S. at 153, 76 S.Ct. at 756. *See also: NLRB v. Rockwell-Standard Corp.,* 410 F.2d 953, 957 (6th Cir.1969). Particular information is subject to disclosure where the Board, applying a "discovery type standard" rather than a trial standard, finds a "probability that the desired information [is] relevant, and that it [will] be of use to the union in carrying out its statutory duties and responsibilities." *NLRB v. Acme Industrial Corp., supra,* 385 U.S. at 437, 87 S.Ct. at 568. *Accord: NLRB v. Rockwell-Standard Corp., supra,* 410 F.2d at 957. Although the ultimate factual determination of relevance depends upon the circumstances of each case, *NLRB v. Truitt Mfg. Co., supra,* 351 U.S. at 153, 76 S.Ct. at 756; *NLRB v. Pearl Bookbinding Co., Inc.,* 517 F.2d 1108, 1113 (1st Cir.1975), information relating to bargaining unit employees' wages, hours, and working conditions is "presumptively relevant". *Teleprompter Corp. v. NLRB,* 570 F.2d 4, 8 (1st Cir.1977). Indeed, 29 U.S.C. § 158(d) creates a duty to bargain collectively "with respect to wages, hours, and other terms and *conditions of employment."* The production standards in the instant case clearly concern "conditions of employment" subject to the statutory mandate of good faith bargaining.

The pertinent inquiry in the action *sub judice* is whether substantial evidence supports the NLRB's determination that the original time study data is relevant and necessary to the Union's bargaining function.[3] The following factual determinations underlie the NLRB's conclusion that, in addition to the elemental breakdown and answers to the "Twenty Questions", the original time study data is relevant and neces-

---

**3.** A factual determination of the NLRB must be affirmed if supported by substantial evidence on the record considered as a whole. *NLRB v. International Molders and Allied Workers Union, Local # 214,* 678 F.2d 657 (6th Cir.1982); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Brown,* 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *NLRB v. United Insurance Co.,* 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); *NLRB v. Howell Automatic Machine Co.,* 454 F.2d 1077, 1080 (6th Cir.1972); *NLRB v. Ogle Protection Service, Inc.,* 375 F.2d 497, 505 (6th Cir.), *cert. denied,* 389 U.S. 843, 88 S.Ct. 84, 19 L.Ed.2d 108 (1967); *NLRB v. Barberton Plastic Products, Inc.,* 354 F.2d 66 (6th Cir.1965).

sary to the Union's bargaining function and grievance evaluation and processing:

> Although Respondent [GM] on at least some previous occasions supplied the Union with what it calls "time study elemental breakdowns," it failed to supply even those with regard to the above-described production standards newly imposed in July 1979 and March 1980. In any event, the instant litigation is not directly concerned with these failures (cf. *Stipulation, Joint Exh. 3*) and it is clear from the "elemental breakdown" itself (e.g., *GC Exh. 51*) as well as from the testimony of Respondent's own witnesses that it is not the same as the time studies, being merely Respondent's alleged summarizations or conclusions—allegedly warranted, in Respondent's *ipse-dixit* opinion—drawn or extrapolated by it from the data allegedly contained in the time studies. It is also clear that such alleged "summarizations" or "conclusions" could be misleading and even erroneous, on the inference as well as mechanical level; that the "elemental breakdowns" can at best be no more accurate than the time-study data from which they allegedly derive; and that error in the time-study data will carry forward and infect the correctness of the "summarizations" or "conclusions" in the "elemental breakdowns." It is, in other words, clear that the "elemental breakdowns"—even though not furnished here by the Employer to the Union—are in any event not the same as, nor a fair substitute for, the time-study alleged observations and data themselves, which, if not made available to the Union, are thereby in effect immunized from question, correction, discussion, or meaningful negotiation.

GM has not seriously challenged the relevance of the original time study data at the administrative or appellate levels. Further, the only discountenance to the ALJ's determination that the original studies are necessary is GM's observation that "*several thousand* production standard grievances have been resolved without the *original* time study worksheets," and that "[f]or forty (40) years the UAW has been able to process its grievances with only the information set forth in Paragraph 79." However, the fact that the Union has not historically fully exercised its statutory right to information does not defeat that right contemporarily nor does it constructively constitute a waiver *ad infinitum*.

■ Accordingly, the NLRB's determination that the original time study data is necessary and relevant to the Union's intelligent and informed processing of grievances relating to production standards is supported by substantial evidence. Indeed, the action *sub judice* is closely analogous to *Timken Roller Bearing Co. v. NLRB,* 325 F.2d 746 (6th Cir.1963), *cert. denied,* 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964) wherein the Union's right to information including "detailed time studies, operating observations, personal motions recordings, and a myriad set of detailed evaluations of every separate element and aspect of the production process" was upheld under Section 8(a)(5) as relevant "wage information" when such was utilized by the employer to establish a fixed wage rate. *Timken* is pragmatically identical to the case at bar with the exception that in *Timken* the information was sought to ascertain the propriety of a wage scale whereas in the instant action the information is sought to ascertain the propriety of GM's conditions of employment, to-wit, production standards. This one distinction, however, is immaterial since both wages and conditions of employment are statutory subjects of good faith bargaining. 29 U.S.C. § 158(d). *See also: NLRB v. Safeway Stores, Inc.,* 622 F.2d 425 (9th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981); *Procter & Gamble Mfg. Co. v. NLRB,* 603 F.2d 1310 (8th Cir.1979); *NLRB v. Otis Elevator Co.,* 208 F.2d 176 (2d Cir. 1953).

■ GM submits that the NLRB abused its discretion by failing to defer to the two umpire decisions which had interpreted "all of the facts of the case", and particularly the 1947 decision of Umpire Seward which provided that the original time study data

was *not* subject to discovery. This Court concludes that the Union's statutory right of access to original time study worksheets has not been determined by prior arbitration decisions. Both the 1947 and 1949 decisions interpreting Paragraph 79 of the bargaining agreement did not address the issue of what statutory rights, if any, co-exist in supplementation to the contractual right of the Union to production standard information. The import of the 1947 decision is that "facts of the case" includes, at a *minimum*, an elemental breakdown. Similarly, the import of the 1949 decision is that "facts" includes, at a minimum, answers to the "Twenty Questions." Accordingly, both decisions are not inconsistent with the NLRB's conclusion that original time study information is necessary and relevant to the Union's bargaining function. Further, as aforediscussed, Umpire Seward's reference to original time study data constituted dictum.

■■■ Alternately, and assuming, *arguendo*, that Umpire Seward's memorandum opinion is construed as a proper interpretation of the collective bargaining agreement rather than dictum, this Court adjudges that the NLRB did not abuse its discretion in failing to defer to that decision. It is well settled that the presence of an arbitration award does not divest the Board of jurisdiction to adjudicate unfair labor practices involving the same subject matter. 29 U.S.C. § 160(a); *NLRB v. Strong*, 393 U.S. 357, 360–61, 89 S.Ct. 541, 544, 21 L.Ed.2d 546 (1969); *John Klann Moving & Truck Co. v. NLRB*, 411 F.2d 261, 263 (6th Cir.), *cert. denied*, 396 U.S. 833, 90 S.Ct. 88, 24 L.Ed.2d 84 (1969); *NLRB v. Horn & Hardart Co.*, 439 F.2d 674, 678 (2d Cir.1971). As the Supreme Court has stated, "[t]he superior authority of the Board may be invoked at any time" and, should the Board disagree with an arbitrator, "the Board's ruling would, of course, take precedence." *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964). *Accord: UAW v. Rockwell International Corp.*, 619 F.2d 580, 583 (6th Cir.1980). Thus, the Board is not required to "defer to the primary determina-

tion of an arbitrator" or otherwise "abstain". *NLRB v. Acme Industrial Co.*, *supra*, 385 U.S. at 437, 87 S.Ct. at 568.

Nevertheless, in order to encourage the private settlement of disputes while simultaneously fulfilling the Congressional mandate to vindicate statutory rights, the NLRB has voluntarily elected to defer to arbitration awards in cases where all parties have agreed to be bound by the award, the proceedings were fair and regular, and the result was not repugnant to the policies and purposes of the Act. *Spielberg Manufacturing Co.*, 112 NLRB 1080 (1955). *See also: Carey v. Westinghouse Elec. Corp.*, *supra*; *International Harvester Co.*, 138 NLRB 932 (1962), *enforced sub nom. Ramsey v. NLRB*, 327 F.2d 784 (7th Cir.1964). The *Spielberg* doctrine, enumerating the three criteria which must be satisfied prior to Board deference, has since been endorsed by the Supreme Court and practically every circuit. *See NLRB v. Plasterers Local No. 79*, 404 U.S. 116, 136–37, 92 S.Ct. 360, 372, 30 L.Ed.2d 312 (1971); *John Klann Moving & Trucking Co. v. NLRB*, *supra*, 411 F.2d at 263.

■■■ The pertinent inquiry is whether the NLRB abused its discretion by failing to adhere to the *Spielberg* doctrine. *NLRB v. South Central Bell Telephone Co.*, 688 F.2d 345 (5th Cir.1982) (citations at note 7). Clearly no such abuse has occurred. To the extent that the 1947 umpire decision concluded that the Union possesses no right to original time study data, such decision is repugnant to the Act, thereby failing to satisfy the third *Spielberg* criteria.

■■■ GM further asserts that the Union waived its statutory right to the original time study data by successively failing to renegotiate the phrase "facts of the case" as embodied in Paragraph 79 and as interpreted by the umpire decisions of 1947 and 1949. Essentially, GM posits that the umpire decisions became the law of the contract.

■■■ It is fundamental that a contractual waiver of a statutorily guaranteed right

must be "clear and unmistakable." *NLRB v. Pepsi-Cola Distributing Co., Inc.,* 646 F.2d 1173, 1176 (6th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982); *Road Sprinkler Fitters Local Union No. 669 v. NLRB,* 600 F.2d 918, 922–23 (D.C.Cir.1979); *General Electric Co. v. NLRB,* 414 F.2d 918, 923 (4th Cir.1969), *cert. denied,* 396 U.S. 1005, 90 S.Ct. 557, 24 L.Ed.2d 496 (1970); *Timken Roller Bearing Co. v. NLRB,* 325 F.2d 746, 751 (6th Cir. 1963); *Central Broadcasting Corp. v. NLRB,* 441 F.2d 1145, 1146 (6th Cir.1971); *Beacon Journal Publishing Co. v. NLRB,* 401 F.2d 366, 367–68 (6th Cir.1968); *NLRB v. Item Co.,* 220 F.2d 956, 958–59 (5th Cir.), *cert. denied,* 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955); *Procter & Gamble Mfg. Co. v. NLRB,* 603 F.2d 1310, 1318 (8th Cir. 1979). *See also NLRB v. Magnavox Co. of Tennessee,* 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974); *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1974). This Circuit has expressly rejected contractual silence as a method of demonstrating "clear and unmistakable waiver" of a statutory right:

> [W]e recognize that the Union could have relinquished this right [to information including data concerning time studies] under the provisions of the bargaining agreement if it, as a part of the bargaining process, elected to do so. But such a relinquishment must be in "clear and unmistakable" language (cites omitted). Silence in the bargaining agreement on such an issue does not meet this test. This Court said in *N.L.R.B. v. J.H. Allison & Co., supra,* 165 F.2d 766, 768, 33 A.L.R.2d 990, C.A. 6th, *cert. denied,* 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369, "Nor do we see logical justification in the view that in entering into a collective bargaining agreement for a new year, *even though the contract was silent* upon a controverted matter, the Union should be held to have waived *any rights secured under the Act,* including its right to have a say-so as to so-called merit increases."

*Timken Roller Bearing, Co., supra,* 325 F.2d at 751. More specifically, the issue of whether a statutory right may be waived through incorporation by silence of a prior arbitration award has recently been addressed and rejected by the Fifth Circuit:

> Thus, in this case the principle that "labor contracts generally state affirmatively what conditions the parties agree to," *Torrington Co. v. Metal Products Workers Local 1645,* 362 F.2d 677, 681 (2d Cir.1966), is particularly apt. Silence should not be and is not dispositive of the parties' intent in a labor contract. Giving the equivalent of *stare decisis* effect to prior arbitration decisions should be compelled by an express clause in the contract, *see Metropolitan Edison Co. v. NLRB,* 663 F.2d 478, 484 (3d Cir.1981), *cert. granted,* 457 U.S. 1116, 102 S.Ct. 2926, 73 L.Ed.2d 1327 (1982); *Riverboat Casino, Inc. v. Local Joint Executive Board,* 578 F.2d 250, 251 (9th Cir.1978), not read into a contract by a court far removed from the negotiations. As this court said recently in a case of direct judicial enforcement of an arbitration award not involving an unfair labor practice charge: "Whether there is a 'law of the contract' between the parties once an arbitrator decides an issue and what effect, if any, is to be given precedent are not primarily, if at all, questions for judicial resolution." *New Orleans Steamship Association,* 626 F.2d at 468.

*NLRB v. South Central Bell Telephone Co., supra,* 688 F.2d at 353.

As in *South Central Bell,* the Company in the action *sub judice* has failed to identify an express clause in the 1979 bargaining agreement "giving the equivalent of *stare decisis* effect to prior arbitration decisions". Further, the instant bargaining agreement is silent on the Union's right of access to the original time study data. This Court concludes that the Union has not clearly and unmistakably waived its statutory right of access to the original time study data.

In accordance with the foregoing, the Order of NLRB is ENFORCED.