*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0338P (6th Cir.)
File Name: 00a0338p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

No. 99-1727
ELECTRICAL WORKERS
LOCAL 58 PENSION TRUST
FUND; ELECTRICAL WORKERS
JOINT BOARD OF TRUSTEES
VACATION FUND;
ELECTRICAL WORKERS'
INSURANCE FUND;
SUPPLEMENTAL
UNEMPLOYMENT BENEFIT
FUND OF THE ELECTRICAL
INDUSTRY, DETROIT;
ELECTRICAL WORKERS
LOCAL 58 ANNUITY FUND,
IBEW; JOINT
APPRENTICESHIP TRAINING
TRUST FUND; NATIONAL
ELECTRICAL BENEFIT FUND,
        *Plaintiffs-Appellees,*

        *v.*

GARY'S ELECTRIC SERVICE
COMPANY,
        *Defendant-Appellant.*

Nos. 99-1727/5862

1

No. 99-5862
NATIONAL LABOR RELATIONS
BOARD,

*Petitioner,*

*v.*

GARY'S ELECTRIC SERVICE
COMPANY,

*Respondent.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit and
On Application for Enforcement of an Order of the
National Labor Relations Board.
No. 98-74631; 7-CA-39300—Anna Diggs Taylor,
District Judge.

Argued:  August 4, 2000

Decided and Filed:  September 25, 2000

Before:  MOORE and CLAY, Circuit Judges; RICE, Chief
District Judge.[*]

———————————

**COUNSEL**

**ARGUED:**   William L. Hooth, COX, HODGMAN &
GIARMARCO, Troy, Michigan, for Appellant/Respondent.
Sheldon M. Meizlish, Detroit, Michigan, for Appellees.

———————————————————

[*] The Honorable Walter H. Rice, Chief United States District Judge
for the Southern District of Ohio, sitting by designation.

Frederick C. Havard, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Petitioner. **ON BRIEF:** William L. Hooth, Ryan L. Perry, COX, HODGMAN & GIARMARCO, Troy, Michigan, for Appellant/Respondent. Sheldon M. Meizlish, Detroit, Michigan, Rolland R. O'Hare, SACHS, NUNN, KATES, KADUSHIN, O'HARE, HELVESTON & WALDMAN, Detroit, Michigan, for Appellees. Aileen A. Armstrong, Andrew J. Krafts, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Petitioner.

————————

### OPINION

————————

CLAY, Circuit Judge. This is a consolidated appeal. In Case No. 99-5862, Petitioner, the National Labor Relations Board ("the Board"), applies to this Court to enforce the Board's order issued against Respondent, Gary's Electric Service Company ("Gary's Electric"). Because there is substantial evidence to support the Board's findings of fact that Respondent violated Sections 8(a)(5) and (1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 141 *et seq.*, and because there are no errors of law in the decision, the Board's order is **ENFORCED**.

In Case No. 99-1727, Defendant, Gary's Electric, appeals from the judgment entered by the United States District Court for the Eastern District of Michigan granting summary judgment to Plaintiffs, Electrical Workers Local 58 Pension Trust Fund; Electrical Workers Joint Board of Trustees Vacation Fund; Electrical Workers' Insurance Fund; Supplemental Unemployment Benefit Fund of the Electrical Industry, Detroit; Electrical Workers Local 58 Annuity Fund, IBEW; Joint Apprenticeship Training Trust Fund; and National Electrical Benefit Fund ("the Funds"), in this action brought by the Funds to enforce two arbitration awards which

resulted from Defendant's alleged breach of the fringe benefit provisions of the Collective Bargaining Agreement between Defendant and the International Brotherhood of Electrical Workers Local 1317 ("the Union"); the first award requires Defendant to make contributions to various fringe benefit funds, and the second award requires Defendant to post a surety bond guaranteeing payment to the benefit fund. For the reasons set forth below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

Defendant/Respondent, Gary's Electric, is a Michigan corporation with its principal place of business located in the City of Waterford, Michigan. Since 1976, Defendant has been engaged in the operation of an electrical construction and maintenance service, serving a variety of residential customers and small shops from its Waterford facility under the direction of its founder and owner, Russell Gary Pipia. Pipia has been a dues-paying member of the Union since 1963, and had maintained that status for himself to the time of the hearing before the Board.

In June of 1976, Pipia's then wife, Anne, signed a letter of assent on behalf of Defendant authorizing Southeastern Michigan Chapter, National Electrical Contractors Association ("NECA") to serve as its collective bargaining representative for all matters contained in or pertaining to the labor agreement between NECA and the Union. On July 29, 1988, Pipia signed another letter of assent ("the Letter of Assent-A") on behalf of Defendant authorizing NECA to serve as its "collective-bargaining representative for all matters contained in or pertaining to the current and any subsequently approved . . . labor agreement between NECA and [the] Union." (J.A. at 102.)[1] The Letter of Assent-A also

---

[1] For ease of reference, the joint appendix submitted in connection with Case No. 99-1727 will be cited as "J.A.;" while the joint appendix submitted in connection with Case No. 99-5862 will be cited as "J.A.II."

Court's mandate in *Jon Wiley & Sons v. Livingstone*, 376 U.S. 543, 546 (1964). Taking as true Defendant's legal assertions regarding these cases does not change the outcome here. First, as discussed, Defendant's affirmative defense of fraud in the execution is without merit. Second, the district court decided that Defendant was required to arbitrate and determined the issues that it was required to arbitrate, when it found that the Board's decision should be given preclusive effect. Therefore, Defendant's final argument is in vain.

For the above stated reasons, we hold that the district court did not err in applying the doctrine of issue preclusion to this case and in granting the Funds' motion for summary judgment.

## IV. CONCLUSION

In Case No. 99-5862, the Board's Order be **ENFORCED**; and in Case No. 99-1727, district court's judgment granting the Funds' motion for summary judgment is **AFFIRMED**.

actions, so must its argument fail in this regard. *See Neosho,* 305 NLRB at 102-03. Defendant argues in the alternative that even if its actions did not repudiate the agreement, then the letter dated February 20, 1997, that Defendant sent to the Union notifying the Union that it was no longer authorized to conduct negotiations for Defendant, clearly repudiated the Letter of Assent-A at that time. Accordingly, Defendant concludes that when the 1995 Agreement expired on May 31, 1998, so did any obligation that it had under the Letter of Assent-A; and, because the arbitration awards to the Funds pertain to a six week period of time after May 31, 1998, the arbitration awards do not draw their essence from any collective bargaining agreement and are void. Defendant's argument fails to consider that pursuant to the Letter of Assent-A, it was required to provide notice of termination to the Union *and* to NECA. Defendant failed to marshal any evidence that it informed NECA of its decision to terminate the Letter of Assent-A to which it had entered, and in fact admitted at oral argument that it never informed NECA of its decision to terminate the Letter of Assent-A. Therefore, Defendant's February 20, 1997 letter to the Union did not terminate the Letter of Assent-A, and the awards draw their essence from the collective bargaining agreements between NECA and the Union at the time. *See Nelson Elec. v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981) (finding that because the employer did not provide notice of termination to both NECA and the Union as provided in the Letter of Assent-A, the employer was bound by the provision of the collective bargaining agreement in force at the time).

In a final repetitive argument, Defendant claims that because there was fraud in the execution of the Letter of Assent-A, the arbitrator's award did not draw its essence from any enforceable collective bargaining agreement, in violation of the Supreme Court's mandate in *United States Workers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). Defendant further contends that whether a company is required to arbitrate, as well as the issues that it is required to arbitrate, must be decided by a court under the Supreme

provided that "[t]his authorization, in compliance with the current approved labor agreement, shall be come effective on the 29th day of July, 1988. It shall remain in effect until terminated by the undersigned employer [Defendant] giving written notice to the Southeastern Michigan Chapter, N.E.C.A. and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement." (J.A. at 102.) Furthermore, the Letter of Assent-A to which Defendant agreed stated as follows:

> The Employer [Defendant] agrees that if a majority of its employees authorizes the Local Union to represent them, in collective bargaining, the Employer will recognize the Local Union as the exclusive collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites [sic].

(J.A. at 102).

At the time Pipia signed the Letter of Assent-A, NECA and the Union were parties to a collective-bargaining agreement, effective June 3, 1987 to May 31, 1989. NECA and the Union entered into a continuous series of successor agreements, including one effective June 4, 1995 to May 31, 1998 ("the 1995 Agreement"). The 1995 Agreement "appl[ied] to all firms who sign[ed] a Letter of Assent" authorizing NECA to bargain with the Union on their behalf. (J.A. at 311.) Defendant had not provided NECA or the Union with written notice of termination of the Letter of Assent-A prior to the effective date of the 1995 Agreement.

At the time Pipia signed the Letter of Assent-A, he employed twelve men: two journeymen electricians (Donald Gabbard and Mark McVicar), and nine "helpers" including Pipia's son, Gary. After executing the Letter of Assent-A, Defendant began remitting dues to the Union on behalf of Gabbard, McVicar, and Gary; Defendant also began making

contractually required fringe benefit fund contributions to the Union on behalf of these men. *Id.*

On July 26, 1989, Gabbard, McVicar, and Gary signed cards authorizing the Union to represent them in collective bargaining with Defendant. On April 30, 1990, the Union sent Defendant a letter requesting recognition as the majority representative of Defendant's employees. This "Agreement for Voluntary Recognition," stated that "[t]he Union claims, and the Employer acknowledges and agrees, that a majority of its employees has authorized the Union to represent them in collective bargaining," and stated that Defendant recognized the Union as its employees' exclusive bargaining representative. Pipia signed the Agreement for Voluntary Recognition on May 10, 1990.

On April 30, 1991 and May 15, 1991, respectively, Defendant permanently laid off McVicar and Gabbard from their jobs, and ceased remitting dues and fringe benefit payments to the Union for each of these men. Defendant continued to submit dues and payments on behalf of Gary until he went away to college; however, after four or five years Gary returned to work at Defendant, and Defendant resumed remitting dues to the Union on Gary's behalf. Pipia at all times remained current on his Union dues.

The Union sent Pipia, as President of Defendant, a letter dated November 22, 1996, wherein the Union advised Pipia as follows:

> It has come to our attention that your company is, or may be, in violation of its collective bargaining agreement with this Union, by reason of the operation of your company or its principals, of another company called Gary's Electrical Service, or by performance of work which would otherwise be performed by your company.
>
> We believe that there is a connection between your company and Gary's Electrical Service either financially or through management personnel, or both, and we

reference to this defense before the Board are identical to those raised in the case at hand, the first prong of the issue preclusion test is met. *Compare Olchowik*, 875 F.2d at 558 (finding that the claims were not identical because they arose out of different factual scenarios).

Furthermore, that the second prong of the issue preclusion test is met in that resolution of the affirmative defense was necessary to the Board's decision. In other words, if the Board had found that Defendant carried its burden in asserting this affirmative defense, the Board necessarily could not have found that Defendant violated § 8(a)(5) and (1) of the Act by refusing to comply with the bargaining agreement. *Olchowik*, 875 F.2d at 558. Contrary to Defendant's argument, the Board's decision regarding the defense was not a mere afterthought; it was central to the Board's conclusion. Finally, the third prong of the issue preclusion test is met because Defendant had a full and fair opportunity to present his defense and argue it before the ALJ. *Id.*

Therefore, because the factors attendant to a determination of whether issue preclusion applies to bar a claim have been met, the district court did not err in applying the doctrine in this case, or in granting the Funds summary judgment. Again, Defendant's arguments to the contrary are without merit. For example, Defendant argues that issue preclusion is not applicable because different statutes are involved. However, as noted above, issue preclusion may apply notwithstanding the fact that the later action is brought under a different statute. *See Olchowik*, 875 F.2d at 557 (citing *Tipler v. E.I. duPont deNemours & Co.*, 443 F.2d 125, 128 (6th Cir. 1997)). Defendant's affirmative defense is analyzed the same for purposes of both suits here. *Compare Tipler,* 443 F.2d at 129.

Defendant also attempts to avoid preclusion by claiming that it repudiated the Letter of Assent-A by its actions. However, just as Defendant's argument failed when it argued that the Union repudiated the Letter of Assent-A by its

the LMRDA [Labor Management Reporting and Disclosure Act], from considering renewed dispute about that fact. An LMRDA action was held to be precluded by a prior NLRB decision where the wrong alleged in the two cases was identical. And a later LMRDA action was precluded by an earlier NLRB finding that the Plaintiff's injury was due to on-the-job misconduct and not to union activity or union membership.

875 F.2d 555, 557 (6th Cir. 1989) (citations omitted, emphasis added).

The *Olchowik* court then opined, however, that the case law does not impose a *per se* rule requiring issue preclusion where a subsequent LMRDA action involves the same general fact situation as the prior NLRB decision. 875 F.2d at 557. Rather, the case law merely requires the Court to impose the test for issue preclusion to the precise issue that one party asserts may be precluded. *Id.* The classic test consists of the following inquiries:

1) is the issue identical to that actually decided by another decisionmaker? 2) was the issue necessary to the earlier judgment? and 3) did the party against whom preclusion would operate have a full and fair opportunity to litigate the issue?

*Id.*

Turning to the matter at hand, the central question raised by Defendant is whether the district court erred in finding that the doctrine of issue preclusion barred Defendant from raising the affirmative defense of fraud in the execution so as to avoid the Funds' attempt to enforce the grievance awards. Defendant raises the affirmative defense of fraud in the execution in reference to its entering into the Letter of Assent-A agreement, just as it did before the Board. Indeed, a review of Defendant's argument in its brief on appeal in this regard clearly indicates the same exact arguments as addressed by the Board. Because the factual and legal arguments raised in

believe that Gary's Electrical Service was created to circumvent the provisions of our collective bargaining agreement.

In order to determine whether there is a violation of our agreement, we request that you provide answers to the questions on the enclosed questionnaire.

Please submit your answers within ten days of this letter.

(J.A.II at 340.) Defendant refused to provide the Union with the information requested via the questionnaire, claiming that Defendant was not then, or ever was, a member of the Union.

Acting on an unfair labor practice charge filed by the Union, on March 27, 1997, the Board's General Counsel issued a complaint alleging that Defendant violated Section 8(a)(5) and (1) of the Act by refusing the Union's request for information relevant to the performance of its representational duties. On March 27, 1998, Administrative Law Judge Robert M. Schwarzbart, ("ALJ") found that Defendant violated the Act as alleged. On September 29, 1998, the Board issued its Decision and Order affirming the ALJ's findings of fact and conclusions of law. The Board now applies to this Court seeking enforcement of its September 29, 1998, Order in Case No. 98-5862.

From the time that the Board's General Counsel filed its complaint against Defendant in March of 1997, until the time the Board issued its order in September of 1998, the Union filed two grievances against Defendant; one in July and one in August of 1998. The grievances stemmed from Defendant's failure to pay contributions for fringe benefits for, or with respect to, work performed by those of its employees who were represented by the Union. The contributions were to be paid to the Funds which were established under and administered pursuant to Section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141 *et seq.*, and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*

According to the Funds' records, Defendant paid fringe benefit contributions from May 15, 1985 (for the work week ending May 14, 1985) to June 1, 1998 (for the work week ending May 30, 1998). Contributions were paid for, or with respect to, work performed by Pipia, Gary, McVicar and Gabbard. In October of 1995, Defendant posted a performance bond with the Funds to guarantee, at least in part, payment of fringe benefit contributions owed. The bond expressly noted that Defendant "has, by assent, become a party to the [collective bargaining agreement] negotiated by and between the Southeastern Michigan Chapter, National Electrical Contractors Association, and Local Union No. 58, International Brotherhood of Electrical Workers and has, by that agreement and earlier such agreements, agreed to pay certain monies to the fringe benefit trust funds described in [specified provisions] of the agreement. . . ." (J.A. at 108-09.) The bond further provided that if Defendant, "in respect to any payment due to the [Funds], fail[ed] or neglect[ed] to pay the amounts required when due, then the surety shall be liable to the [Funds] for any and all unpaid amounts, but not exceeding the amount set out in the first paragraph of this obligation." (J.A. at 109.)

As stated, the Union filed two grievances against Defendant. The first grievance was for Defendant's failure to pay fringe benefit contributions and the second for failure to secure the surety bond inasmuch as the bond Defendant had posted was cancelled. In accordance with the Collective Bargaining Agreement, the matter was brought before the Joint Labor-Management Committee ("JLMC") for arbitration, and a hearing was held on the matter. The JLMC conducted the hearing on August 20, 1998, and found in favor of the Funds on the charges specified in the grievances against Defendant. The JLMC awarded the Funds by ordering Defendant to remedy its violation of the fringe benefit provisions of the Collective Bargaining Agreement by submitting all necessary reports, paying the amounts due, and by filing future reports and paying future dues timely. The award also ordered Defendant to remedy its violation of the

On appeal, Defendant contends that the district court erred in giving the Board's decision preclusive effect because 1) the Board's finding as to Defendant's defense of fraud in the execution was not necessary to the Board's decision; 2) the Board has no special expertise in determining the defense; and 3) and the Board's decision involved a different statute with a different inquiry and focus than the present action. Defendant maintains that because the Letter of Assent-A was entered into under fraudulent circumstances, Defendant was not bound by any Collective Bargaining Agreement from which the awards could draw their essence. We disagree.

This Court reviews a district court's decision with regard to issue preclusion *de novo*. *See Gargallo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 918 F.2d 658, 660 (6th Cir. 1990). "[I]ssue preclusion, or collateral estoppel, dictates that once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving any party to the prior litigation." *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 583 (6th Cir. 1994).

In *Olchowik v. Sheet Metal Workers' International Assoc.*, this Court opined as follows regarding issue preclusion as it applies to NLRB decisions:

> We do not doubt that, in an appropriate case, a factual determination by the NLRB will be binding, by the doctrine of issue preclusion, on a federal court in another action. When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose. *Further, an issue may be precluded notwithstanding the fact that the later action is brought under a different statute.* Thus, a factual determination by the NLRB in an action under the NLRA may preclude a federal court, hearing a case under

the non-moving party's case. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir. 1989) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317; 106 S. Ct. 2548 (1986)).

In ruling upon the Funds' motion for summary judgment in this case, the district court opined as follows:

> Well, it appears to the Court from all that's been presented here, that, first of all, the Court is constrained to abide by the decision of the NLRB on the matters that were presented and appropriately decided, apparently under its jurisdiction.
>
> That is, at this point, the decision of the highest authority in existence on such matters and [sic] governs and collaterally estops challenges elsewhere to its propriety.
>
> The fact that it has apparently gone to the Sixth Circuit for enforcement does not lessen its obligation imposed upon this Court to abide by this decision.
>
> And the Court is to abide by that of the Joint Labor Management Committee.
>
> And I must, therefore, confirm the arbitration awards that have been entered. They certainly draw their essence from the contract; they essentially state the existence of the contract and its obligations.
>
> And that's the only issue presented for this Court's examination, actually that is whether the awards draw their essence from the contract.
>
> The defendant must comply with the awards and the Court will award costs and attorney fees as the contracts required.

(J.A. at 134-35.)

---

Collective Bargaining Agreement by securing a surety bond in an amount set forth in the schedule provided in "Article VIII, Section 6(B) of said Agreement." (J.A. at 106.)

Defendant refused to comply with the awards as ordered. Therefore, the Funds filed suit in district court on October 23, 1998, seeking to enforce the awards. The Funds filed a motion for summary judgment on February 9, 1999, arguing that no genuine issue of material fact remained for trial as to the Funds' claims, based in part upon the Board's September 9, 1998, Order. The district court granted the Funds' motion on May 18, 1999. Defendant filed a notice of appeal to this Court, which is at issue before us in Case No. 99-1727.

## II.  APPLICATION FOR ENFORCEMENT OF THE BOARD'S ORDER

The scope of this Court's review of the Board's findings is limited:

> A reviewing court may not disturb the Board's findings of fact where there is substantial evidence on the record considered as a whole to support the Board's findings. The Board's findings must be set aside when the record demonstrates that the Board's decision is not "justified by a fair estimate of the worth of the testimony of witnesses" or by the Board's "informed judgment on matters within its special competence or both." When there is conflict in the testimony, "it is the Board's function to resolve questions of fact and credibility," and thus this court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor.
>
> The Board's application of the law to particular facts is also reviewed under the substantial evidence standard, and the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it de novo. *Evidence is considered*

*substantial if it is adequate, in a reasonable mind, to uphold the decision.* The appellate court should consider the evidence contrary to the Board's conclusions, but may not conduct a de novo review of the record.

If the Board errs in determining the proper legal standard, the appellate court may refuse enforcement on the grounds that the order has "no reasonable basis in law."

*Turnbull Cone Baking Comp. of Tenn. v. NLRB,* 778 F.2d 292, 295 (6th Cir. 1985) (citations omitted, emphasis added).

In its Decision and Order, the Board found and concluded as follows:

As the judge found, the Respondent's [Defendant's] execution of "Letter of Assent-A" in July 1988 created an 8(f) bargaining relationship between the Union and the Respondent [Defendant]. Thus, Letter of Assent-A conferred on the National Electrical Contractors Association (NECA) the authority to act as the Respondent's [Defendant's] representative for all matters contained in the current, and any subsequent, collective-bargaining agreements. Because the Respondent did not timely withdraw this authority, the authorization remained in effect and, thereafter, the Respondent [Defendant] become bound by a series of collective-bargaining agreements. As an 8(f) bargaining representative, the Union was entitled to information relevant to the enforcement and possible breach of a bargaining agreement that was the source of its Section 8(f) bargaining authority. *Oliver Insulating Co.*, 309 NLRB 725, 726 (1992) enfd. 995 F.2d 1067 (6th Cir. 1993).

Subsequent to the July 1988 execution of Letter of Assent-A, the Respondent [Defendant] executed a document in May 1990 in which it acknowledged that "a majority of its employees has authorized the Union to

collective bargaining agreement in any respect. None of these circumstances are present in this case.

We are also not persuaded by Defendant's claim that the Union's inattentiveness led Defendant to believe that it was not bound by the Agreement, or was tantamount to the Union's repudiation of the Letter of Assent-A. The repudiation by conduct doctrine typically requires something more than mere breach of the 8(f) contract, in that the employees and the parties must be put on notice that the contract was void. *See Neosho Construction*, 305 NLRB 100, 102-03 (1991). In the case at hand, no such circumstances existed. Although it is true that the Union was inattentive to Defendant, it is equally true that there was never a complete hiatus in Defendant's relationship with the Union and that, at the bare minimum, Defendant always made contributions on behalf of Pipia and Gary. *See id.*

For all of the above stated reasons, we hold that substantial evidence exists on the record to support the Board's decision, and that there are no errors of law in the decision. Accordingly, the Board's Decision and Order is **ENFORCED**.

## III. CHALLENGE TO THE DISTRICT COURT'S ORDER GRANTING SUMMARY JUDGMENT TO PLAINTIFFS FOR ENFORCEMENT OF THE ARBITRATION AWARDS

This Court reviews a district court's order granting summary judgment *de novo*. *Equitable Life Assur. Soc'y v. Poe,* 143 F.3d 1013, 1015 (6th Cir. 1998). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of

(J.A. at 87-88.)  The ALJ went on to note, however, that the record supported Pipia's claim that the Union had a long period of "inattentiveness" to Defendant's employees. (J.A. at 88.)

Fraud in the execution is an affirmative defense, and the defendant bears the burden of proving the defense.  *See Hetchkop v. Woodlawn At Grassmere, Inc.*, 116 F.3d 28, 31 (2d Cir. 1997).  Fraud in the execution causes a party to believe that the agreement it signs has essential terms different from those that actually appear in the contract.  *Id.* at 32.  Thus, proof of fraud in the execution voids a contract. *Id.*  "Fraud will not lightly be inferred and in the absence of such gross mistakes as would necessarily imply bad faith or a failure to exercise an honest judgment, [an agreement] may not be set aside . . . ."  *NLRB v. Volney Felt Mills, Inc.*, 210 F.2d 559, 560 (6th Cir. 1954).

In this case, Pipia's testimony basically comes down to his claim that he was ignorant of the type of arrangement to which he was agreeing when he signed the Letter of Assent-A.  In order to show excusable ignorance, the party asserting the defense must show that it carried its "basic responsibility . . . to review a document before signing it."  *Hetchkop*, 116 F.3d at 34.  Defendant has failed to demonstrate that Pipia carried out his basic responsibility to review the Letter of Assent-A.  In fact, in arguing that the Letter of Assent-A did not create a § 8(f) relationship on appeal, Defendant conspicuously ignores language at the beginning of the Letter of Assent-A wherein he authorized the NECA to act as Defendant's collective-bargaining representative for all matters pertaining to the union and the collective bargaining agreements.  Defendant's reliance on *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501, 1503 (9th Cir. 1984) is misplaced in that the employer in *Gilliam* was able to prove fraud in the execution because the union's agent represented the labor and trust fund agreements as "standard forms signed by owner-operators," the employer had never dealt with the union before, and the employer had not complied with the

represent them in collective bargaining."  Although the complaint alleged the existence of a 9(a) relationship, the General Counsel relied principally on the execution of "Letter of Assent-A" in July 1988 to establish the 8(a)(5) and (1) violation alleged in the complaint.  Indeed, the General Counsel filed no exceptions to the judge's finding that it had "not asserted the existence of a Section 9(a) relationship" and that "the relationship had not advanced beyond the [Section] 8(f) stage."

In these circumstances, and although the Respondent [Defendant] correctly notes that the complaint alleged a 9(a) relationship, we find that the judge properly found that the bargaining obligation arose and continued under Section 8(f) of the Act.  Because the requested information pertained to enforcement of a contract to which the Respondent [Defendant] was bound by its grant of bargaining authority, the judge also properly found that the Respondent [Defendant] violated Section 8(a)(5) and (1) of the Act by failing and refusing to supply it.

(J.A. at 84)( footnotes omitted).

Under Section 8(f) of the Act, employers and unions in the construction industry are permitted to enter into collective bargaining agreements before the union has established its majority status.  Either party is free to repudiate the collective bargaining relationship once a § 8(f) contract expires by its terms.  *See Gottfried v. Sheet Metal Workers Local 80*, 876 F.2d 1245, 1249 (6th Cir. 1989).  "However, an automatic renewal clause between the parties to an § 8(f) agreement will be given effect and operates to bind the parties to a continuation of the agreement."  *NLRB v. Ross Bros. Construction Co.*, No. 95-5135, 1997 WL 215513, at **2 (6th Cir. Apr. 29, 1997) (unpublished *per curiam*) (citing *Cedar Valley Corp. v. NLRB*, 977 F.2d 1211, 1216 n.5 (8th Cir. 1992)).  "This is so even where the renewal clause operates to bind a party to an independent, secondary agreement, the

terms of which may be open to negotiation by different parties and remain undetermined." *Id.* (citing *Farmingdale Iron Works, Inc.*, 249 NLRB 98, 102 (1980)).

When an employer repudiates a collective bargaining agreement that has yet to expire, it violates § 8(a)(5) and (1) of the Act, unless covered employees have voted to reject the union as their bargaining representatives in a board-conducted election. *See John J. Deklewa & Sons, Inc.*, 282 NLRB 1375, 1377 (1987), *enforced sub nom, Ironworkers, Local 3 v. NLRB*, 843 F.2d 770 (3d Cir. 1988). Under § 8(f), the union is entitled to information relevant to the enforcement and possible breach of the collective bargaining agreement that was the source of its bargaining authority. *See Oliver Insulating Co.*, 309 NLRB 725, 726 (1992), *enforced,* 995 F.2d 1067 (6th Cir. 1993).

Here, the Board agreed with the ALJ that Defendant's failure to provide the Union with the information that it requested in the questionnaire and November 22, 1996 letter sent by the Union to Defendant, violated § 8(a)(5) and (1) of the Act because the information requested pertained to the 1995 Agreement to which Defendant as a unit had become bound. We believe that substantial evidence on the record supports the Board's findings and conclusion.

The record indicates that Pipia signed the Letter of Assent-A on behalf of Defendant authorizing NECA to serve as its "collective-bargaining representative for all matters contained in or pertaining to the current and any subsequent approved . . . labor agreement between Southeastern Michigan Chapter, N.E.C.A. and Local Union 58, IBEW." (J.A. at 102) (footnote omitted). The Letter of Assent-A also provided that "[t]his authorization, in compliance with the current approved labor agreement, shall be come effective on the 29th day of July, 1988." (J.A. at 102.) The record indicates that at the time Pipia signed the Letter of Assent-A, NECA and the Union were parties to a collective-bargaining agreement, effective June 3, 1987 to May 31, 1989, and that NECA and

assent executed on June 1, 1976, by Anne Pipia, then-Pipia's wife, and by Landa on behalf of the Union. Although Pipia testified that he had not been aware of the existence of the document until it was shown to him at the hearing and that his former wife had not been an officer of the Respondent corporation situated to so obligate Respondent, Anne Pipia had signed the document as the Respondent's president.

While Pipia did not know who James P. Malley was and did not recall having received correspondence from him, the record shows that on July 21, 1988, Malley, a since-retired union business agent, had sent the Respondent a memorandum announcing that the Union was in the process of updating its contractor files and requesting certain information from the Respondent. Also, contrary to Pipia's inability to recall the prior correspondence from Malley and his denial of the efficacy of the above 1976 letter of assent signed by his former wife, an August 31, 1988 memorandum to Pipia from Mally acknowledged receipt of the contractor paperwork previously requested to update the Respondent's contractor file. This August 1988 memo also noted that Pipia's signature was on the wrong line on the Agreement for Voluntary Recognition and requested that he sign the then-enclosed Agreement for Voluntary Recognition and return it to the Union's office as soon as possible. This reference to an Agreement for Voluntary Recognition with the Union, even if signed on the wrong line, existing almost 2 years before the like May 10, 1990, Agreement, the only one previously indicated by Pipia, presents possibilities that an earlier Agreement for Voluntary Recognition had been executed in conjunction with the 1976 letter of assent or that, if stemming from the July 1988 letter of assent, that Pipia had been less than complete in describing his relationship with the Union.

relationship continued even though the Board rejected the Union's claimed § 9(a) status).

Defendant's final argument, that it was not obligated to comply with the Union's November 20, 1996, information request because there was fraud in the execution of the Letter of Assent-A and, as such, it was not bound by the 1995 Agreement, was also properly rejected by the Board. The Board stated as follows when it rejected Defendant's contention: there is "no merit to the Respondent's contention that the testimony of Respondent's owner, Russell Gary Pipia, established that Letter of Assent-A was executed under misleading and fraudulent circumstances." (J.A. at 84 n.2.)

Indeed, Defendant's claim of fraud in the execution is based solely on Pipia's testimony before the ALJ. When considering Defendant's testimony on this matter, the ALJ opined as follows:

> Pipia's testimony describing the start of his relationship with the Union was shaky. In addition to the timing and accuracy of the July 7, 1989, letter concerning the purchase of Loomis Electric [by Pipia], on cross-examination, contrary to repeated prior testimony that he had signed the July 1988 letter of assent while at the union hall, Pipia testified that he may have mailed the signed letter of assent to the union hall and that he did not remember speaking to any Union representatives before signing that document. Then, on redirect, Pipia reaffirmed that he had visited the hall on July 29, 1988, with his son and the two other employees at which time he had signed the letter of assent. On the other hand, he also related that the three signed authorization cards, dated July 26, 1989, were there on that occasion.

> Also contrary to Pipia's testimony that the July 29, 1988, letter of assent was the first such document the Respondent had executed with respect to this Union, the record of this proceeding contains an identical letter of

the Union entered into a continuous series of successor agreements, including one effective June 4, 1995 to May 31, 1998 -- "the 1995 Agreement". (J.A.II at 241-339.) The 1995 Agreement "appl[ied] to all firms who sign[ed] a Letter of Assent" authorizing NECA to bargain with the Union on their behalf. (J.A. II at 311.)

Therefore, when the Union requested information from Defendant on November 22, 1996, it clearly remained bound by the 1995 Agreement, particularly when Defendant had not withdrawn from the NECA. *See Carpenters Local 345 Health & Welfare Fund v. W.D. George Construction Co.*, 792 F.2d 64, 69 (6th Cir. 1986) (finding that employer that had delegated bargaining authority to an association was bound to a subsequent association-union agreement where employer did not timely withdraw the delegated authority). Because the information requested regarded the enforcement of the 1995 Agreement, it was relevant to the Union's ability to fulfill its duties. Accordingly, a reasonable person would find that the record adequately supports the Board's conclusion that Defendant violated § 8(a)(5) and (1). *See Oliver*, 309 NLRB at 726; *see also General Motors Corp. v. NLRB*, 700 F.2d 1083, 1088 (6th Cir. 1983) (finding that the union need not affirmatively demonstrate the relevance of information requested).

We are not persuaded otherwise by Defendant's arguments raised to this Court. First, Defendant argues that it was not bound by the successive NECA-Union agreements because the Letter of Assent-A was only Defendant's promise to recognize the Union should it attain majority status. In this regard, Defendant argues that from the outset the Union was attempting to establish a relationship with Defendant based upon majority status, which is a § 9(a) relationship, not a § 8(f) relationship, because the Letter of Assent-A expressly provides that "If a majority of its employees authorize the local union to represent them in a collective bargaining agreement, the employer will recognize the local union as the exclusive collective bargaining agent for all employees . . . ."

(J.A. at 102.)  However, what Defendant's argument fails to consider is that it was entering into the Letter of Assent-A under § 8(f) status because it did not have majority status at the time.  *See City Elec., Inc.*, 288 NLRB 443, 444 (1988) (finding that because the employer was "engaged in the construction industry and that it entered into its contractual relationship with the [u]nion at a time when the [u]nion's majority status had not been established, . . . the relationship between [the employer] and the [u]nion [was] governed by Section 8(f) of the Act, and not Section 9(a)").

Moreover, the language of the Letter of Assent-A which immediately precedes that quoted by Defendant, specifically states that "the undersigned firm does hereby authorize Southeastern Michigan Chapter, N.E.C.A. as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent approved . . . labor agreement between [NECA and the Union]," and the Letter of Assent-A was signed by Pipia as President of Defendant.  Therefore, by entering into the Letter of Assent-A, Defendant was agreeing to be bound by the terms of the collective bargaining agreement, including the 1995 Agreement in question.  In the similar case of *City Electric, Inc.*, the Board opined as follows:

> [W]e agree with the judge's conclusion that the Respondent [Employer] violated Section 8(a)(5) and (1) about June 24, 1980, when it refused to abide by and execute the 1980-1981 collective-bargaining agreement negotiated for it by NECA.  The Respondent voluntarily entered into an 8(f) relationship with the Union.  By the Letter of Assent-A it signed in 1977, the Respondent authorized NECA to represent it in collective bargaining and agreed to be bound by the then current bargaining agreement.  Further, the Respondent's authorization to NECA did not terminate at the end of the current agreement, but bound it to successive agreements as well.  This authorization continued unless the Respondent subsequently took some action effectively withdrawing

> the multiemployer group's authority to bargain on the Respondent's behalf.  As the judge properly found, no notice of withdrawal of such bargaining authority had been given at the time the 1980-81 agreement was "binding, enforceable, and not subject to unilateral repudiation by the Respondent."

288 NLRB at 444 (footnotes omitted).

Thus, as in *City Electric, Inc.*, by its actions Defendant entered into a § 8(f) agreement with the Union.  Furthermore, substantial evidence supports the Board's finding that the relationship between Defendant and the Union "had not advanced beyond the [Section] 8(f) stage . . . [and] that the bargaining obligation arose and continued under Section 8(f) of the Act;" it did not arise out of a § 9(a) relationship.  Indeed, in footnote 2 of its Decision and Order, the Board rejected Defendant's argument in this regard, by specifically noting the language set forth at the outset of the Letter of Assent-A:

> Contrary to the Respondent's [Defendant's] contention, the obligations created by Letter of Assent-A do not "only" come into play if a majority of employees authorize the Union to represent them.  Rather, the initial language set forth in the document creates a bargaining obligation, under   Section 8(f), based on the Respondent's conferral of bargaining authority to NECA to enter into bargaining agreements with the Union.

(J.A. at 84 n.2.)

Defendant's alternative argument, that the Union forfeited its § 8(f) status when it sought majority recognition from Defendant, also fails under *City Electric, Inc.*  The Union does not forfeit its § 8(f) status by seeking a majority status; the parties are bound by the Letter of Assent-A and the series of § 8(f) agreements made in relation thereto until such time that proper termination of the relationship is made.  *See City Electric, Inc.*, 288 NLRB at 444(finding that the § 8(f)